21-631(L)
*1199 SEIU United Healthcare Workers East v. PSC Community Services*

# In the
# United States Court of Appeals
## For the Second Circuit

———————

August Term, 2023

(Argued:  January 17, 2024        Decided: July 10, 2026)

Docket Nos. 21-631(Lead), 21-633(Con), 22-1587(Con)

———————

1199 SEIU UNITED HEALTHCARE WORKERS EAST,

*Petitioner-Appellee,*

—v.—

CHINESE-AMERICAN PLANNING COUNCIL HOME ATTENDANT PROGRAM,
UNITED JEWISH COUNCIL OF THE EAST SIDE HOME ATTENDANT SERVICE
CORP.,

*Respondents-Appellees,*

GAIL YAN, ALVARO RAMIREZ GUZMAN, ELIDA AGUSTINA MEJIA HERRERA,
LETICIA PANAMA RIVAS, EUGENIA BARAHONA ALVARADO, RAFAELA
CRUCETA, VIRTUDES DURAN, WAI KAM LOU, YUE MING WU, CUI YING MAI,

*Appellants,*

MEI KUM CHU, SAU KING CHUNG, QUN XIANG LING, EPIFANIA HICHEZ,
CARMEN CARRASCO, SEFERINA ACOSTA, MARIA DIAZ,

*Intervenors-Appellants,*∗

PSC COMMUNITY SERVICES, NEW PARTNERS, INC. D/B/A PARTNERS IN CARE,
STELLA ORTON HOME CARE AGENCY, INC., RICHMOND HOME NEEDS,
SUNNYSIDE HOME CARE PROJECT, SUNNYSIDE CITYWIDE HOME CARE, FAMILY

---

∗ These seven individuals are identified as Intervenors-Appellants on this Court's docket. The
district court granted none of their motions to intervene, however. We nonetheless retain the
designation for ease of reference to subgroups of Appellants.

HOME CARE OF BROOKLYN AND QUEENS, CARE AT HOME, THE FIRST CHINESE PRESBYTERIAN COMMUNITY AFFAIRS HOME ATTENDANT CORP., AZOR HOME CARE, BUSHWICK STUYVESANT HEIGHTS HOME ATTENDANTS, INC. CABS HOMECARE, RIVERSPRING LICENSED HOMECARE SERVICES AGENCY, INC., ST. NICHOLAS HUMAN SUPPORTS CORP., WARTBURG, ALLIANCE FOR HEALTH, INC., REGION CARE, INC., SPECIAL TOUCH HOME CARE SERVICES, INC., RAIN, INC., PRESTIGE HOME CARE, INC., PRESTIGE HOME ATTENDANT, INC., D/B/A ALL SEASON HOME ATTENDANT, PERSONAL TOUCH CARE OF N.Y., INC., PRIORITY HOME SERVIES, PREMIER HOME HEALTH CARE, INC., BRONX JEWISH COMMUNITY COUNCIL HOME ATTENDANT SERVICES, CIDNY INDEPENDENT LIVING SERVICES, HOME CARE SERVICES FOR INDEPENDENT LIVING, NEW YORK FOUNDATION FOR SENIOR CITIZENS HOME ATTENDANT SERVICES, INC. COOPERATIVE HOME CARE ASSOCIATES, RISEBORO HOME CARE, INC., FEGS HOME ATTENDANT SERVICES, HOME HEALTH MANAGEMENT SERVICES, INC., SCHOOL SETTLEMENT HOME ATTENDANT CORP., ROCKAWAY HOME ATTENDANT, BRONXWOOD HOME FOR THE AGED, INC., ACCENTCARE OF NY, INC., ISABELLA VISITING CARE, INC., SOCIAL CONCERN COMMUNITY DEVELOPMENT CORP., ABC HEALTH SERVICES REGISTRY, ALLIANCE HOME SERVICES, INC., COLLECTIVELY IDENTIFIED BY THE ARBITRATOR AS HOME HEALTH CARE AGENCIES,

*Respondents,*

RAMONA DE LA CRUZ, DULCE HERRERA PALMA,

*Intervenors.***

B e f o r e :

WALKER, CARNEY, and LEE, *Circuit Judges.*

———————

These three consolidated appeals arise in connection with a union's petitions to confirm two class arbitration awards. In 2019, in accordance with its many collective bargaining agreements and on behalf of more than 100,000 current and former home healthcare workers, 1199 SEIU United Healthcare Workers East asserted wage-and-hour claims under federal, state, and local law in an arbitration brought against over 40

---

** As above, these two individuals are identified as Intervenors on our docket, although the district court did not grant the motions to intervene of either. Again, we retain the designation for ease of reference to subgroups.

employers in the New York City area. In 2020, the Arbitrator issued a first award, finding that (1) he had authority to decide whether the Union and Employers had agreed to arbitrate the claims presented, and that (2) in a 2015 Memorandum of Agreement (2015 MOA) amending their collective bargaining agreements, the parties agreed to mandatory arbitration of those claims. In 2022, the Arbitrator issued a second award, determining that the Employers, to varying degrees, violated wage statutes starting as early as 2008. He awarded damages to Union members on an individual basis and required that the Employers jointly create a special wage fund of approximately $30 million for use in compensating employees who had been underpaid. He further established a rapid payout schedule to employees who submitted claims for underpayment. The Union sought and won confirmation of each award in proceedings in the United States District Court for the Southern District of New York (Koeltl, *J.*), without opposition from the Employers. The wage fund was duly formed and fully distributed to union member claimants soon after the second award was made, and before we heard argument in these appeals.

In the meantime, beginning in 2016 (three years before the arbitration began), several individuals who had worked for an Employer but who had left their jobs before the 2015 MOA was entered into filed suits in state court against their former employers, asserting statutory wage claims that accrued during the period of their employment. They sought to proceed individually and on behalf of putative classes. The former employers' motions to dismiss and to compel arbitration in those suits uniformly failed: the New York State courts reasoned that the Union could not retroactively bind individuals who were no longer members to mandatory arbitration of their statutory claims.

The Arbitrator excluded by name nine individual employees who had filed suit in state court from the Awards' effect. Some of those who were not excluded and were plaintiffs in the state court actions or members of the putative classes sought without success to intervene in or otherwise object to the confirmation orders. Those individuals and some related others now appeal the district court's confirmation orders in Nos. 22-631, 22-633, and 22-1587. Some of those individuals and other similarly situated individuals separately challenge the district court's refusal to remand their actions to the state court in the tandem appeals pending in Nos. 21-2106 and 21-2107. Meanwhile, several state courts have stayed their related state court proceedings pending resolution of this appeal.

On review, we first conclude that it was for the district court, not the Arbitrator, to decide the threshold question whether and if so, when, the Union and the Employers clearly and unmistakably agreed to mandatory arbitration of the statutory wage claims.

3

Second, addressing *de novo* the question of arbitrability, we decide that the Union and Employers did not agree to mandatory arbitration of statutory wage claims until they entered the 2015 MOA. We further identify error in the district court's decision to deny intervention to those individuals who sought it. We reach this conclusion because those individuals left their covered employment before the 2015 MOA was signed; when the Union entered the 2015 MOA it could not lawfully waive those individuals' rights to obtain judicial consideration of their accrued claims absent some manifestation of consent; and a binding arbitral award affected their substantial rights to pursue their claims in state court. Finally, and for similar reasons, we determine that the district court erred by confirming the Awards insofar as they purport to bind these individuals.

For these reasons, we vacate the district court's orders and judgments as to Appellants and Appellants-Intervenors and their four Respondent employers, and we remand for further proceedings consistent with this opinion.

VACATED IN PART AND REMANDED.

––––––––––––

LAUREVE BLACKSTONE, Levy Ratner, P.C., New York, NY (James Reif, Gladstein, Reif & Meginniss, LLP, New York, NY, *on the brief*), *for Petitioner-Appellee*.

DAVID J. BARON (Kenneth Kirschner, *on the brief*), Hogan Lovells US LLP, New York, NY, *for Respondents-Appellees.*

LADONNA M. LUSHER (Kara Sue Miller, Michele A. Moreno, Alanna Sakovits, *on the brief*), Virginia & Ambinder, LLP, New York, NY, *for Appellants*.

MICHAEL TAUBENFELD, Fisher Taubenfeld LLP, New York, NY, *for Intervenors-Appellants and Intervenors.*

––––––––––––

CARNEY, *Circuit Judge*:

These consolidated appeals concern claims for statutory wage-and-hour law violations pursued by Petitioner-Appellee 1199 SEIU United Healthcare Workers East (the Union) in a 2019 arbitration that it brought against 42 employers (the Employers,

Respondents-Appellees and Respondents here) on behalf of a class of more than 100,000 of the Union's members, home healthcare workers in the New York City area.

In arbitral decisions issued in 2021 and 2022, the Union won a multi-million-dollar award against the Employers for past violations of federal, state, and local wage laws. The Arbitrator ordered the Employers to create a joint fund and to comply with a plan for rapid payouts to employees who had been underpaid. The Union petitioned for and won confirmation of both awards from the United States District Court for the Southern District of New York (Koeltl, *Judge*) under Section 301 of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185.

During the period for which the Union sought recovery of employees' unpaid wages—from roughly 2008 through 2017—it represented employees of one or more of the Employers, including the two Respondent-Appellee Employers here, Chinese-American Planning Council Home Attendant Program (CPC), and United Jewish Council of the East Side Home Attendant Service Corp. (UJC), certain of whose former employees challenge the Awards' binding effect on them. The Union also represented employees of two Respondent-Employers subject to an appeal in two related cases, removed from state court, in challenges that we heard in tandem with these: No. 21-2106, *Guzman v. The First Chinese Presbyterian Community Affairs Home Attendant Corp.*, and No. 21-2107, *Alvarado v. Alliance for Health, Inc.* Those two additional Employers are The First Chinese Presbyterian Community Affairs Home Attendant Corp. (FCP) and Alliance for Health, Inc. (Alliance).

The Union brought the 2019 arbitration in reliance primarily on the terms of its 2015 Memorandum of Agreement (the 2015 MOA) with the Employers, in which they jointly amended their collective bargaining agreements (CBAs) to mandate arbitration of statutory wage-and-hour claims. The arbitration addressed the wage claims of current employees of the Employers as well as claims of those employees who left their home healthcare employment—and consequently, their bargaining unit and union

5

membership—before December 2015, when the 2015 MOA became effective (the Pre-2015 MOA Employees). The Awards excluded nine of those Pre-2015 MOA Employees individually by name but otherwise drew no distinction between employees who were still bargaining unit members when the 2015 MOA was entered into and those who had earlier ended their employment and, accordingly, their union membership.

Beginning in early 2015, certain of the Pre-2015 MOA Employees filed state lawsuits against their Employers, including CPC, UJC, FCP, and Alliance, asserting the same types of statutory wage-and-hour claims as the Union did about three years later in the 2019 arbitration. Applying state law contracting principles, several state courts hearing those claims determined while the arbitration was ongoing that the plaintiffs, and, potentially, a class of similarly situated Pre-2015 MOA Employees of the named defendant Employers, were not bound by the 2015 MOA's mandatory arbitration provision. The state appellate division courts affirmed those decisions on appeal. *See Konstantynovska v. Caring Pros., Inc.*, 103 N.Y.S.3d 364 (1st Dept. 2019); *Lorentti-Herrera v. All. for Health, Inc.*, 104 N.Y.S.3d 103 (1st Dept. 2019); *Hichez v. United Jewish Council of the E. Side*, 117 N.Y.S.3d 214 (1st Dept. 2020), *lv. denied*, 37 N.Y.3d 909 (2021); *Teshabaeva v. Family Home Care Servs. of Brooklyn & Queens, Inc.*, 156 N.Y.S.3d 21 (1st Dept. 2021); *Pustilnik v. Premier Home Health Care Servs., Inc.*, 164 N.Y.S.3d 446 (1st Dept. 2022).[1]

Meanwhile, in the federal district court, the Union petitioned for confirmation of the Arbitrator's 2021 award on jurisdictional issues (the First Award), and, a year later, for confirmation of the Arbitrator's 2022 merits award (the Second Award). It sought a

---

[1] No class has yet been certified in any of the state court actions brought by Appellants or Intervenors-Appellants here. But classes have been certified in three other cases brought by Pre-2015 MOA Employees against Respondents-Employers. *See Troshin v. Stella Orton Home Care Agency, Inc.*, 141 N.Y.S.3d 297 (Sup. Ct. N.Y. Cnty. 2021); *Teshabaeva v. Family Home Care Servs. of Brooklyn & Queens, Inc.*, No. 158949/2017, 2022 WL 2870135 (Sup. Ct. N.Y. Cnty. July 15, 2022), *aff'd*, 198 N.Y.S.3d 24 (1st Dept. 2023); *Pustilnik v. Premier Home Health Care Servs.*, No. 155081/2016, 2022 WL 16856128 (Sup. Ct. N.Y. Cnty. Nov. 10, 2022).

confirmation order by which the Awards would bind all Union members and Employees, past and present, with the sole exception of the nine named Pre-2015 MOA Employees, whose state court actions had been brought to the Arbitrator's attention. The Arbitrator excluded these nine individuals by name from the First and Second Awards, leaving them ineligible to collect under the Awards' terms but free to proceed separately. *See* note 20, *infra*.

Certain Pre-2015 MOA Employees moved in the district court to intervene in the first and second confirmation proceedings and then to dismiss the petition to confirm the Second Award. Among the grounds those pre-2015 MOA Employees presented were that they did not agree to arbitrate these claims; they were not union members when the Union agreed to mandatory arbitration and so the Union could not waive their rights to judicial consideration of their claims; and that accordingly the Second Award could not bind them or other similarly situated Pre-2015 MOA Employees. In short, they demanded that—regardless of the purported scope of the 2015 MOA and of the two Awards—they be free to pursue their own claims against their former Employers in state court, and to represent a class of similarly situated individuals while doing so.

The district court denied their intervention motions and confirmed both Awards in their entirety—that is, as to all Union members except for those nine whom the Arbitrator had expressly excluded because of their state court actions. It ruled primarily that the Pre-2015 MOA Employees who had sought intervention lacked standing to obtain it; that they had no actionable legal claims that would free them of the Awards' binding effect because they alleged no breach by the Union of its duty of fair representation as to them; that they had in any event, through the Union, delegated the question of arbitrability to the Arbitrator, who had conclusively determined that the matter was arbitrable; and also, on deferential review of the Arbitrator's decision, that the 2015 MOA bound them as it did other Union members, past and present, to

7

arbitrate their accrued statutory wage claims. Certain of the Pre-2015 MOA Employees (identified as "Appellants" or "Intervenors-Appellants" in the case caption) timely appealed those determinations.

Upon due consideration, we now conclude that the district court erred in denying intervention to the Pre-2015 MOA Employees who sought it. We further identify error in the district court's rulings that, first, the Union and Employers delegated the question of the claims' arbitrability to an arbitrator, and, second, that the Union and the Employers could lawfully agree, and indeed agreed, to submit the statutory wage claims of the Pre-2015 MOA Employees to mandatory arbitration without their explicit or implicit consent. Finally, we decide that the Awards do not preclude the Appellants or Intervenors-Appellants from pursuing wage claims against their former Employers in state court. We express no view about whether any individual Appellant or Intervenor-Appellant may properly represent a class in any such proceeding.

We therefore vacate those portions of the district court's judgments and orders that confirm the Awards insofar as they purport to cover Appellants or Intervenors-Appellants here, and we remand the matter for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are extensive but, as relevant here, almost entirely undisputed. They are documented in the record made by the Union and the Employers during the related arbitration proceedings, which spanned the four years from 2019 through 2022 and covered employment periods from roughly 2008 through 2022. They are also captured in the three main consolidated district court proceedings, the two district court proceedings that we heard in tandem with these (appeals that we do not decide today,

as noted), and, from and after 2016, in the several generally related New York Supreme Court, Appellate Division, and United States District Court proceedings.

What is subject to dispute is who, among the Pre-2015 MOA Employees who are parties to this appeal and who are identified in the caption as Appellants or Intervenors-Appellants is bound by the Awards, and who is not. Those who are not bound by the Awards are instead at liberty to pursue their pending state court actions against their respective Employers, identified as Respondents-Appellees or Respondents in the caption.

We begin in subpart (A), below, by reviewing the identities of the parties as relevant to these three consolidated appeals. We then turn in (B) to describing the Union's and the Employers' collective bargaining agreements since 2012 and amendments jointly made by them since then, with a focus on the terms of the 2015 MOA. Next, in (C), we outline the state court actions for wage law violations filed by certain Appellants, Intervenors-Appellants, and others beginning in 2015. Finally, in (D), we trace the closely intertwined arbitration proceedings brought by the Union in 2019, the two Awards issued in 2021 and 2022, the related confirmation proceedings in the district court in the same years, and the appeals of that district court's several related orders.

### I.      The parties

Appellants and Intervenors-Appellants are all Pre-2015 MOA Employees. We refer to these two groups together as the Named Appellants.[2] In the period from about 2008 through 2015—but not after—the Named Appellants were employed as home health care workers in the New York City area by one of four Employers: (1)

---

[2] For ease of reference, we include at the close of this opinion a short glossary of the terms of art we found useful to adopt in identifying the groups and subgroups of affected individuals discussed in this opinion.

Respondent-Appellee Chinese-American Planning Council Home Attendant Program (CPC); (2) Respondent-Appellee United Jewish Council of the East Side Home Attendant Service Corp. (UJC); (3) Respondent First Chinese Presbyterian Community Home Healthcare Corp. (FCP); (4) or Respondent Alliance for Health, Inc. (Alliance). We refer to CPC, UJC, FCP, and Alliance, together, as the Named Employers. During the terms of their employment as home healthcare workers with one or more of the Named Employers, the Named Appellants were Union members and accordingly were subject to essentially identical CBAs entered into by the Union and their Employers in 2012. The CBAs were in effect until modified by Memoranda of Agreement (MOAs) entered into in 2014, and then, most critically, in December 2015.

The Named Appellants left their employment—and, therefore, their bargaining unit and Union memberships—sometime after the enactment in 2014 and 2015 of new, worker-protective federal, state, and local wage-and-hour laws aimed at the home healthcare industry.[3] Their departures came while the Union and the Employers were discussing the question how best to address employee wage claims anticipated to arise under those laws. All the Named Appellants contend that they were no longer Union members in early December 2015, when the Union and the Employers amended their

---

[3] *See* 29 C.F.R. §§ 552.6, 552.109 (effective January 1, 2015)**;** New York Home Care Worker Wage Parity Law, N.Y. Pub. Health Law § 3614–c; New York Labor Law, N.Y. Lab. Law §§ 1-1200 (as amended 2014). A key issue in this legislation was how to address compensation for employees who spent the night at the home of the person for whom they were providing in-home health care services. *See generally Concerned Home Care Providers, Inc. v. Cuomo*, 783 F. 3d 77, 81–82 (2d Cir. 2015); David Bornstein, *A Living Wage for Caregivers*, The New York Times (July 10, 2015, 7:00 AM), https://archive.nytimes.com/opinionator.blogs.nytimes.com/2015/07/10/organizing-for-the-right-to-care/.

2012 CBA to provide that wage claims brought under those statutes would be subject to mandatory arbitration.[4]

Appellants are ten individuals who were employed by one or more of the Named Employers before 2015 and, although they were not parties to the arbitration proceedings, which involved only the Union and the Employers, were presumptively included in the Union's class-action grievance.[5] Intervenors-Appellants and Intervenors,

---

[4] The Union disputes the assertions of two Appellants regarding their respective employment statuses when the 2015 MOA was adopted. As to Wai Kam Lou, the Union asserts that she "continued to work well into 2016," Appellee's Br. at 31; in contrast, Wai Kam Lou asserts by affidavit that she worked only until February 2014. As to Virtudes Duran, the Union asserts that she "did not work after August 2010," which was before the period of the Awards' coverage for her Employer began, *id.*; she asserts by affidavit that she worked though 2012. We return to these factual disputes below.

[5] For ease of reference, Appellants are: Gail Yan, Alvaro Ramirez Guzman, Elida Agustina Mejia Herrera, Leticia Panama Rivas, Eugenia Barahona Alvarado, Rafela Cruceta, Virtudes Duran, Wai Kam Lou, Yue Ming Wu, and Cui Ying Mai. Appellants can be usefully grouped by the state court suits that they are associated with, as follows:

- o Alvaro Ramirez Guzman, Elida Agustina Mejia Herrera, and Leticia Panama Rivas are named plaintiffs in *Guzman v. The First Chinese Presbyterian Community Affairs Home Attendant Corp.*, Index No. 157401/2016 (Sup. Ct. N.Y. Cnty.) (*Guzman*), a putative class action against FCP. They are also Plaintiffs-Appellants in No. 21-2106. Gail Yan is a putative class member in the *Guzman* action.

- o Wai Kam Lou, Gail Yan, Rafaela Cruceta, Virtudes Duran, and Cui Ying Mai are Appellants here and former Employees of FCP. They are not named plaintiffs in a pending state court action, but are potential members of a possible certified *Guzman* class against FCP. Yue Ming Wu is a former employee of CPC and a potential class member in the *Chu* action, see note 6, below.

- o Eugenia Barahona Alvarado is the named plaintiff in *Alvarado v. Alliance for Health, Inc.*, Index No. 155417/2018 (Sup. Ct. N.Y. Cnty.) (*Alvarado*), a putative class action against Alliance. She is also a plaintiff-appellant in No. 21-2107. *Alvarado* was formerly captioned *Lorentti-Herrera v. Alliance for Health, Inc.*, but it was renamed after its other named plaintiff was dismissed from the suit. *See Guzman v. First Chinese Presbyterian Cmty. Affairs Home Attendant Corp.*, 520 F. Supp. 3d 353, 358 n.4 (S.D.N.Y. 2021).

11

as identified in the case caption, are nine former employees of one of the Named Employers who were also presumptively included in the Union's grievance.[6]

As we explain below, the Awards excluded nine individuals by name, citing state court decisions brought to the Arbitrator's attention; these decisions, rendered before the Awards issued, expressly found those individuals not bound by the 2015 MOA. Seven of those nine individuals are Appellants or Intervenors-Appellants here.[7] Appellants and Intervenors-Appellants all unsuccessfully sought to intervene in the district court proceedings; each asserts that she or he was not a member of a bargaining

---

[6] For ease of reference, Intervenors-Appellants are: Mei Kum Chu, Sau King Chung, Qun Xiang Ling, Epifania Hichez, Carmen Carrasco, Seferina Acosta, and Maria Diaz. Intervenors-Appellants can also be usefully grouped by the state court actions that they filed, as follows:

- o Mei Kum Chu, Sau King Chung, Qun Xiang Lin are named plaintiffs in *Chu v. Chinese-Am. Plan. Council Home Attendant Program*, Index No. 651947/2016 (Sup. Ct. N.Y. Cnty.) (*Chu*), a putative class action against CPC; and

- o Epifania Hichez, Carmen Carrasco, and Seferina Acosta are named plaintiffs in *Hichez v. United Jewish Council of the East Side Home Attendant Serv. Corp.*, Index No. 653250/2017 (Sup. Ct. N.Y. Cnty.) (*Hichez*), a putative class action against UJC.

Intervenors are Ramona De La Cruz and Dulce Herrera Palma, both former UJC employees. Neither joined in any appeal here, and we do not include them in our discussion or decision.

[7] The nine excluded individuals include seven individuals who were excluded by name from the Awards and are also named as Appellants or Intervenors-Appellants in the caption of these three consolidated appeals (Nos. 21-631, 21-633, and 22-1587). They are: Alvaro Ramirez Guzman, Elida Agustina Mejia Herrera, Leticia Panama Rivas, Epifania Hichez, Carmen Carrasco, Seferina Acosta, and Eugenia Barahona Alvarado. Two individuals were excluded by name from the Awards and are not parties to this appeal. They are Maral Agarunova and Boris Pustilnik, each of whom was a named plaintiff in a state court case that resulted in a separate decision. *See* App'x I at 57 n.2, 84 & n. 18; note 20, *infra*.

Ten individuals named in the caption of these appeals were not excluded by name from the Awards. They are: Gail Yan, Rafaela Cruceta, Virtudes Duran, Wai Kam Lou, Yue Ming Wu, Cui Ying Mai, Mei Kum Chu, Sau King Chung, Qun Xiang Ling, and Maria Diaz.

12

unit represented by the Union and therefore not subject to the 2015 MOA when it was signed in December 2015: by then, they say, each had stopped working for his or her Employer. Appellants and Intervenors-Appellants alike desire to escape the apparent binding effect on them and the classes they wish to represent of the First and Second Awards, as confirmed by the district court.

As described above, Petitioner-Appellee 1199 SEIU is a labor union that was party to the underlying arbitration and that, as the exclusive bargaining representative of each of the Employers' workers, in 2012 negotiated a CBA with each Employer, and at the end of 2015, signed the 2015 MOA.

Respondents are 40 employers in the home healthcare industry that were parties to the arbitration and are bound by the confirmed Awards.[8] Two additional employers—CPC and UJC, who employed certain of the Named Appellants—are identified as Respondent-Appellees here. But some of the Named Appellants also worked for two other Respondent-Employers, FPC and Alliance, and pursued claims against them in state court in proceedings that were removed to federal court. Those

---

[8] Respondents are: PSC Community Services, New Partners, Inc., d/b/a Partners in Care, Stella Orton Home Care Agency, Inc., Richmond Home Needs, Sunnyside Home Care Project, Sunnyside Citywide Home Care, Family Home Care of Brooklyn and Queens, Care at Home, The First Chinese Presbyterian Community Affairs Home Attendant Corp., Azor Home Care, Bushwick Stuyvesant Heights Home Attendants, Inc., CABS Homecare, Riverspring Licensed Homecare Services Agency, Inc., St. Nicholas Human Supports Corp., Wartburg, Alliance for Health, Inc., Region Care, Inc., Special Touch Home Care Services, Inc., Rain, Inc., Prestige Home Care, Inc., Prestige Home Attendant, Inc., d/b/a All Season Home Attendant, Personal Touch Care of N.Y., Inc., Priority Home Services, Premier Home Health Care, Inc., Bronx Jewish Community Council Home Attendant Services, CIDNY Independent Living Services, Home Care Services for Independent Living, New York Foundation for Senior Citizens Home Attendant Services, Inc., Cooperative Home Care Associates, Riseboro Home Care, Inc., Fegs Home Attendant Services, Home Health Management Services, Inc., School Settlement Home Attendant Corp., Rockaway Home Attendant, Bronxwood Home For the Aged, Inc., Accentcare of NY, Inc., Isabella Visiting Care, Inc., Social Concern Community Development Corp., ABC Health Services Registry, and Alliance Home Services, Inc.

13

removals are the subject of two appeals, Nos. 21-2106 and 21-2107, heard in tandem with the three consolidated appeals before us, and our decision bears on those two Respondent-Employers as well. Accordingly, we treat those Respondent-Employers as de facto Appellees here. Each has submitted briefs in the tandem appeals and, to all appearances, has had a full opportunity to present their arguments.[9]

## II. The 2012 CBA, the 2014 MOA, and the 2015 MOA

In 2012, on substantially parallel terms, the Employers entered into CBAs (the 2012 CBA) with the Union. Article XXVI of the 2012 CBA established a procedure for managing employee and Union grievances with the Employers. Beginning with informal conversations between the Employer and the Union, Article XXVI called for two more formal steps before reaching the fourth and final step, at which any still-unresolved "grievance" would "be submitted for final and binding arbitration under the [2013] Labor Arbitration Rules of the American Arbitration Association [(the AAA Rules)]." App'x I at 120.[10] The Employers and the Union also stipulated that "[t]he arbitrator has full authority to decide the issue or issues in dispute, except that s/he does not have authority to amend, alter, modify, add to or subtract from the provisions of this Agreement." *Id.*

After new, worker-protective legislation on wages for home healthcare workers was passed around 2014, the Union and the Employers strained to reach agreement on how to address the claims that might arise under those statutes. In 2014, they entered a Memorandum of Agreement (the 2014 MOA) declaring, in essence, only that they were

---

[9] We do not here decide the tandem appeals in Nos. 21-2106 and 21-2107.

[10] "App'x I" refers to the joint appendix filed in Nos. 21-631 and 633, and "App'x II" refers to the joint appendix filed in Nos. 21-631, 21-633, and 22-1587.

working on resolving the issue. *See Guzman*, 2019 WL 1502944, at *2-3. It was not until a year later, in early December 2015, that terms of an agreement were agreed to and that the Union and each Employer entered a Memorandum of Agreement (the 2015 MOA), to be effective as of December 1, that would address those claims.

As relevant here, the 2015 MOA amended the 2012 CBA by stating new agreements on many wage-related issues raised by the new legislation. In particular, the 2015 MOA added an entirely new article, entitled "Alternative Dispute Resolution" (the ADR Article), to the 2012 CBA. In the ADR Article, the Union and Employers agreed that any claim between them that "ar[ose] under the Fair Labor Standards Act ('FLSA'), New York Home Care Worker Wage Parity Law, or New York Labor Law ('NYLL')," would be "subject exclusively[] to the grievance and arbitration procedures" that the ADR Article set out.[11] App'x I at 145.

The ADR Article set forth detailed procedures for handling a claim brought under these statutes—far more detailed than those set forth in the 2012 CBA for use in resolving "grievances." It set strict claim-processing timelines and established a period

---

[11] More completely, the clause read:

> The parties agree a goal of this Agreement is to ensure compliance with all federal, state, and local wage hour law and wage parity statutes. Accordingly, to ensure the uniform administration and interpretation of this Agreement in connection with federal, state, and local wage-hour and wage parity statutes, all claims brought by either the Union or Employees, asserting violations of or arising under the [FLSA], New York Home Care Worker Wage Parity Law, or New York Labor Law (collectively, the "Covered Statutes"), in any manner, shall be subject exclusively, to the grievance and arbitration procedures described in this Article . . . All such claims if not resolved in the grievance procedure, including class grievances filed by the Union . . . shall be submitted to final and binding arbitration before Martin F. Scheinman, Esq.

App'x I at 145.

of "mandatory mediation." *Id*. Any claim not resolved in the earlier stages that it prescribed would be "submitted to final and binding arbitration before Martin F. Scheinman, Esq." *Id.* The ADR Article further set forth rules for conducting discovery and admitting evidence in any resulting arbitration and established the parties' agreement "not to contest court confirmation of an arbitration award rendered under this Article." *Id.* at 146.

### III.   The state court actions filed in 2015 and 2016 for wage law violations

Beginning in 2015, before the 2015 MOA was concluded, certain Pre-2015 MOA Employees (including some of the Named Appellants) brought suit in New York State courts against their former employers, alleging statutory claims under federal, state, and local laws, including FLSA and the NYLL.[12] These individuals proceeded on their

---

[12] The Named Appellants identify eight state court actions filed in this period in which one or more of the Pre-2015 MOA Employees sought to recover unpaid wages from their former Employers under statutes covered by the 2015 MOA. Intervenors-Appellants' Br. at 5–7. We list those directly relevant to this appeal below:

- *Chu v. Chinese-Am. Plan. Council Home Attendant Program*, Index No. 651947/2016 (Sup. Ct. N.Y. Cnty.) (*Chu*). Chu, Chung, and Ling, Intervenors-Appellants here, are named plaintiffs in *Chu*. There, they allege wage law violations by CPC and seek to represent all similarly situated former employees of CPC. CPC removed the case to the SDNY. The district court remanded the case to state court. *See Chu v. Chinese-Am. Plan. Council Home Attendant Program, Inc.*, 194 F. Supp. 3d 221 (S.D.N.Y. 2016).

- *Hichez v. United Jewish Council of the E. Side Home Attendant Serv. Corp.*, Index No. 653250/2017 (Sup. Ct. N.Y. Cnty.) (*Hichez*). Hichez, Carrasco, and Acosta, Intervenors-Appellants here, are named plaintiffs in *Hichez*. There, they allege wage law violations by UJC and seek to represent all similarly situated former employees of UJC.

- *Guzman v. The First Chinese Presbyterian Community Affairs Home Attendant Corp.*, Index No. 157401/2016 (Sup. Ct. N.Y. Cnty.) (*Guzman*). Guzman, Herrera, and Rivas, Appellants here, are named plaintiffs in *Guzman*. There, they allege wage law violations and seek to represent all similarly situated former employees of FCP. FCP removed the case to the Southern District of New York, where Alvarado of Alliance joined. *See Guzman*, 520 F. Supp. 3d at 355.

16

own behalf, with other named plaintiffs, or in some cases as putative class representatives. The parties agree that the Union could have represented these plaintiffs (indeed, would have been bound to represent them) as to these claims had they still been members of a Union bargaining unit when the 2015 MOA was executed or had they consented to Union representation. From the record before us, however, it appears that no named plaintiff in these state court actions was a member of or had so consented when the 2015 MOA became effective in early December 2015.[13] So, they argued in these actions, the Union had no authority to waive their right to have their wage claims adjudicated in a judicial forum.[14]

In three separate decisions involving one or more of Respondent-Appellees here, the state courts uniformly adopted the position of the Named Appellants and rejected the Employers' motions to compel arbitration.[15] A federal district court in the Southern

---

o In *Alvarado v. Alliance for Health, Inc.*, Index No. 155417/2018 (Sup. Ct. N.Y. Cnty.) (*Alvarado*), Alvarado, an Appellant here, is a named plaintiff, alleging wage law violations and seeking to represent all similarly situated former employees of Alliance.

[13] The district court encountered several disputes in this regard, based on apparently unrebutted Union records raising questions about the status of certain of the Named Appellants. *See 1199SEIU United Healthcare Workers E. v. PSC Cmty. Servs.*, 530 F. Supp. 3d 588, 598 n.6 (S.D.N.Y. 2021). But it does not appear that the district court conducted any factual findings as to these individuals, and, as we discuss in greater detail below, we leave these factual disputes to the state courts to resolve, based on a more complete record.

[14] On several occasions before filing the 2019 grievance—including in a proceeding before the National Labor Relations Board—the Union also took the position, based on the *Chu* decision, that employees who were no longer Union members when the 2015 MOA was signed were not bound by it. *See, e.g.*, App'x I at 182, 184–85, 187–88, 189–90. In the 2019 arbitration and subsequent confirmation proceedings, however, it reversed its position.

[15] In *Guzman*, the district court held that "plaintiffs, who were no longer employed by [defendant] when the MOA was signed, are not bound by its alternate dispute provisions." 2019 WL 1502944, at *3. In *Lorentti-Herrera* (which in 2018 became *Alvarado v. Alliance for Health, Inc.*, No. 155417/2018, after its other named plaintiff was dismissed from the suit), the First

17

District of New York did the same after the employer removed the case from state court. *See Chu*, 194 F. Supp. 3d at 228.[16] In each case, the court reasoned that the Named Appellants were not bound to arbitrate their statutory wage claims because (1) only the clauses added by the 2015 MOA (and not any earlier agreement) made arbitration of such claims mandatory, and (2) the Named Appellants, as Pre-2015 MOA Employees, were not working for their respective Employers when the 2015 MOA was signed and thus were not bound by it. So far as the record shows, state courts have invariably reached the same conclusions in cases brought by other Pre-2015 MOA Employees against their respective former Employers.[17]

Similarly, in another suit brought by a Pre-2015 MOA Employee, a district court in the Eastern District of New York concluded that the employee was not bound by the mandatory arbitration clause in the 2015 MOA because "she was neither an employee of Defendant nor represented by the Union" as of its effective date. *Agarunova v. Stella Orton Home Care Agency, Inc.*, No. 16-cv-0638-MKB, 2019 WL 1332647, at *4 (E.D.N.Y.

---

Department ruled that "neither [plaintiff] nor any other class member who was not employed by defendant when the MOA was entered into is bound by the MOA's arbitration provision." 104 N.Y.S.3d at 104. And at the start of 2020, in *Hichez*, the First Department held that "[a]s former employees or retirees[,] . . . 'whose work has ceased with no expectation of return,' plaintiffs were not members of the bargaining unit represented by the Union" when the 2015 MOA was executed and were therefore not bound to arbitrate their statutory wage claims under the 2015 MOA. 117 N.Y.S.3d at 2116.

[16] The district court explained that "plaintiffs may not be bound by subsequently adopted amendments to a collective bargaining agreement to which they were not parties" and concluded on that basis that no federal claim supported removal under Section 301 of the LMRA. *Chu*, 194 F. Supp. 3d at 228.

[17] *See Konstantynovska v. Caring Pros., Inc.*, 103 N.Y.S.3d 364 (1st Dept. 2019); *Teshabaeva v. Family Home Care Servs. of Brooklyn & Queens, Inc.*, 156 N.Y.S.3d 21 (1st Dept. 2021); *Pustilnik v. Premier Home Health Care Servs., Inc.*, 164 N.Y.S.3d 446 (1st Dept. 2022); *see also Troshin v. Stella Orton Home Care Agency, Inc.*, Index No. 159312/2026 (Sup. Ct. N.Y. Cnty. Sept. 11, 2020) (granting permanent injunction prohibiting arbitration of plaintiff's claims on same basis).

18

Mar. 25, 2019). The employer there appealed, and we affirmed by summary order. *Agarunova v. Stella Orton Health Care Agency, Inc.*, 794 F. App'x 138 (2d Cir. 2020). As relevant here, we stated that "[t]he district court correctly concluded . . . that Agarunova was not bound to arbitrate her statutory claims by the 2015 MOA because she was no longer an employee nor represented by the union as of December 16, 2015, the date of the signing of the 2015 MOA." *Id.* at 140. For reasons set forth in the margin, however, that non-precedential decision did not address the focal arguments presented here and, while consistent with our decision today, does not resolve the questions before us.[18]

To be sure, a person's employment status with respect to an employer that has a CBA with a union does not correspond perfectly to the person's union membership status. Federal labor law recognizes a "policy of voluntary unionism." *Pattern Makers' League of N. Am., AFL-CIO v. NLRB*, 473 U.S. 95, 105 (1985). Thus, unions are generally free, subject to certain limited constraints, to structure their membership as they see fit. *See id.* at 105–07. Just as an individual may generally forgo union membership without leaving her bargaining unit, *see id.* at 106, so too may an individual leave a bargaining unit without necessarily ending her union membership, depending on the union's constitution and bylaws. The parties here have not disputed, however, that the Union membership of each Named Appellant ended virtually concurrently with her termination of employment. Oral Arg. Tr. at 37:21–38:5. We therefore accept the Named

---

[18] In *Agarunova*, we determined that the employer had waived the issue of whether the 2012 CBA or the 2015 MOA delegated the threshold question of arbitrability to the arbitrator—that is, whether the 2012 CBA or 2015 MOA had reserved for an arbitrator, rather than a court, the question whether the parties had agreed to arbitrate the claims at issue. 794 F. App'x at 140. That question, as we explain below, is squarely presented by Appellants here, and its resolution is necessary to our decision.

Appellants' general assertion that their Union memberships also became a thing of the past when they left their jobs with the Employers in question.[19]

## IV.    The Union's class action arbitration proceedings and related district court proceedings

In January 2019, alleging violations of several wage-and-hour statutes, the Union filed a class action grievance "on behalf of all of its home [health] care bargaining unit members," without excluding Pre-2015 MOA Employees—*i.e.*, those who were not members when the 2015 MOA became effective—and covering damages accruing during the period from roughly January 2008 through December 2018. App'x I at 191. The Union's grievance presented "[s]ix (6) categories of claims," as the Arbitrator later described. App'x II at 80. These were:

> 1) Claims for minimum pay and benefit rates on Medicaid funded assignments pursuant to the New York Home Care Worker Wage Parity Law, 2) Claims for spread of hours premiums under the New York Minimum Wage Order for Miscellaneous Industries and Occupations, 12 N.Y.C.R.R. Part 142 . . . 3) Claims for overtime compensation under the FLSA, 4) Claims for pay for interruptions of sleep and meal periods occurring during 24-hour shifts, pursuant to New York's Minimum Wage Order as interpreted by the New York State Department of Labor, 5) Claims for travel time and pay, and 6) Claims for wage notice and wage statement

---

[19] Consistent with the Union's representation at oral argument, *see* Oral Arg. Tr. at 37:21–24, the Union's constitution, published on its website, currently provides in Article V, Section 5(a), that only "persons working as employees in bargaining units" represented by the Union are eligible for Union membership. *See* 1199 Constitution, available at: https://www.1199seiu.org/constitution (last accessed July 7, 2026). Neither party contends that the Union's constitution has changed in this respect since the Named Appellants ceased employment with their respective Employers. For present purposes, Federal Rule of Evidence 201(b)(2) permits us to take judicial notice of the Union's constitution, which the Union is required to file with a public agency. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); 29 U.S.C. § 431(a) (requiring unions to file copies of their constitutions with the Department of Labor).

20

violations under New York's Wage Theft Prevention Act, New York Labor Law §§195(1), 195(3).

*Id.* The claims thus overlapped in part with the statutory claims already brought by certain of the Named Appellants in the *Chu*, *Hichez*, *Guzman*, and *Alvarado* class actions, *see* note 12, above, as well as those asserted in the other pending state court actions filed by one or more of the Pre-2015 MOA Employees.

A. The First Award and the First Confirmation Order, opening appeals No. 21-631 and 21-633

The grievance proceeded through the steps set forth in the 2015 MOA without resolution until, at the Union's request, it was submitted to final and binding arbitration before Arbitrator Martin F. Scheinman, Esq. Upon taking the reins, the Arbitrator decided to address the matter in two separate proceedings. In the first, he would consider two threshold issues: (1) the scope of his jurisdiction and (2) the arbitrability of the Union's class action claims against the 42 Employers. Then, if his resolutions of those gateway questions permitted, he would separately address the grievance's merits as to each Employer. If he found statutory violations, he would prescribe an appropriate remedy.

In April 2020, the Arbitrator issued his First Award. In it, he concluded that, under the 2012 CBA and the 2015 MOA, the Union's grievance was arbitrable: that is, that the Union and the Employers had decided to arbitrate statutory wage-and-hour claims such as those the Union advanced. He further decided that he had jurisdiction to adjudicate "all claims arising under the federal, state and local laws named in the [2015 MOA], as well as any pending litigation or administrative action on the identical claims, irrespective of whether employees' employment terminated prior to the effective date of the [2015 MOA]." App'x I at 85. He limited his jurisdiction in one specific respect: his later decision on the grievance's merits would not bind "those individual [named]

21

Plaintiffs whose claims have been held not subject to arbitration by state or federal court(s)." *Id.* at 84.[20]

In May 2020, the Union petitioned the district court for an order confirming the First Award. No Employer opposed the petition. Certain Pre-2015 MOA Employees filed two separate motions to intervene and/or dismiss the petition, however.[21] Those two movant groups sought dismissal of the confirmation petition on the ground that the First Award was not final and subject to district court confirmation until after issuance of a Second Award, resolving the merits. Finally, they urged that in any event claim- and issue-preclusion rules largely barred the district court from confirming the First Award as to them in particular, because several state courts had already determined that the Union did not have authority to arbitrate on their behalf. The Arbitrator had expressly excluded three of the movants—that is, Epifania Hichez,

---

[20] The Arbitrator identified these nine individuals as follows:

(1) Maral Agarunova (sole plaintiff in the *Agarunova* action);

(2) Epifania Hichez, (3) Carmen Carrasco, and (4) Seferina Acosta (the three named plaintiffs in the *Hichez* action);

(5) Alvaro Ramirez Guzman, (6) Elida Agustina Mejia Herrera, and (7) Leticia Panama Rivas (the three named plaintiffs in the *Guzman* action);

(8) Boris Pustilnik (sole plaintiff in the *Pustilnik* action); and

(9) Eugenia Barahona Alvarado (named plaintiff in the *Alvarado* action);

*See* App'x I at 57 n.2, 84 & n.18; App'x II at 79 n.4.

[21] Appellant Gail Yan moved to dismiss. Intervenors-Appellants, former employees of CPC and UJC, Mei Kum Chu, Sau King Chung, Qun Xiang Ling, Epifania Hichez, Carmen Carrasco, Seferina Acosta, and Maria Diaz and Intervenor Dulce Herrera Palma separately moved to intervene and to dismiss. *See* Case No. 1:20-cv-03611-JGK, Dkt. Nos. 101, 103.

Carmen Carrasco, and Seferina Acosta, named plaintiffs in the *Hichez* action—from the First Award. *See* App'x I at 84.

In February 2021, the district court denied the motions to intervene and to dismiss and confirmed the First Award. *See 1199 SEIU United Healthcare Workers E. v. PSC Cmty. Servs.*, 520 F. Supp. 3d 588, 598 (S.D.N.Y. 2021) (the "First Confirmation Order"). Relying primarily on *Katir v. Columbia Univ.*, 15 F.3d 23 (2d Cir. 1994), the district court concluded that the movants lacked standing to challenge the First Award. *See id*. It reached this conclusion, it said, because they were not parties to the arbitration, which was between the Union and the Employers, and that they neither alleged that the Union "breached its statutory duty of fair representation" to them nor that the Union "failed to act upon the award." *Id.* at 599 (internal quotation marks omitted).

The district court also ruled in the alternative that the movants failed to satisfy the Rule 24 requirements for intervention, explaining that "at minimum [they] failed to demonstrate that their interests would be impaired and are not being adequately represented" by the Union. *Id.* Their only cognizable "interest," it thought, "would be their potential entitlement to compensation for violations of labor laws or the terms of the CBA." *Id.* at 600. But, in the district court's view, this interest was "adequately represented" by the Union and the interest would not be impaired if they were not permitted to intervene. *Id.* The district court noted, too, that movants Epifania Hichez, Seferina Acosta, and Carmen Carrasco were expressly excluded from the First Award. Their exclusion by name from the Award "emphasize[d] that their intervention would be inappropriate," in the district court's view. *Id.* at 601.

Even so, the district court proceeded to discuss the movants' motions to dismiss and found them meritless. First, it determined that the Union and the Employers intended the First Award to be final with respect to the issues before the Arbitrator at that time, making the petition for confirmation timely and the motion to dismiss

23

baseless. *Id.* at 601–03.[22] Second, it reasoned that because the Union "was not a party to the prior [state court] litigations" and the Named Appellants "failed to demonstrate that the Union was in privity" with any party in those state court proceedings, neither claim nor issue preclusion rules applied to bar the Union's claims. *Id.* at 604.

The district court accordingly confirmed the otherwise uncontested First Award in its entirety. The district court found that the Union and the Employers had in the 2012 CBA and the 2015 MOA agreed "to delegate questions of arbitrability and jurisdiction to the Arbitrator." *Id*. at 606. As to the substance of the jurisdictional dispute, it decided that the Arbitrator's ruling "dr[e]w its essence from the CBA" and thus passed muster under the "highly deferential" form of review of an arbitral proceeding prescribed for the district court by Section 301 of the LMRA. *Id.* at 607. The district court also accepted the Arbitrator's decision that the Awards would cover those employed by an Employer during the period covered by the grievance, including those who had left the Union by the 2015 MOA's effective date and excepting only those expressly excluded by him. *Id*.

The movants appealed, opening **Nos. 21-631** and **21-633** in our court.[23]

---

[22] The Named Appellants take the position that their finality challenge to the First Confirmation Order would "become moot" were we to vacate the First and Second Awards for other reasons. Intervenors-Appellants' Suppl. Br. at 4. In light of our resolution of the remainder of their claims, we agree that we need not further address the finality argument.

[23] A notice of appeal was filed by Appellants Gail Yan, Eugenia Barahona Alvarado, Alvaro Ramirez Guzman, Elida Agustina Mejia Herrera, and Leticia Panama Rivas as a group (in No. 21-631), and by Intervenors-Appellants Mei Kum Chu, Sau King Chung, Qun Xiang Ling, Epifania Hichez, Carmen Carrasco, Seferina Acosta, and Maria Diaz (in No. 21-632). *See* Case No. 1:20-cv-03611-JGK, Dkt. Nos. 163, 165. Appellants Eugenia Barahona Alvarado, Alvaro Ramirez Guzman, Elida Agustina Mejia Herrera, and Leticia Panama Rivas joined Gail Yan's notice of appeal but did not join any of the motions to intervene or dismiss the petition to confirm the First Award.

B.  <u>The Second Award, Preliminary Injunction Order, and Second Confirmation Order, opening appeal No. 22-1587</u>

In late February 2022, while those two appeals were pending, the Arbitrator issued the Second Award.[24] He ruled that the Employers violated applicable wage-and-hour statutes by underpaying the more than 100,000 former and current employees represented by the Union in amounts and in periods that varied by Employer. He set a default nine-year period of January 2013 through October 2021 for each Employer's accrued liability for wages owed, with longer periods as to some, including each of the Named Employers.[25]

After examining multiple submissions, "including employee affidavits . . . [and] Employer financial records," App'x II at 121, he also prescribed a detailed remedy, taking account of "the level of funding needed to assure fair compensation to the employees, and the financial stability of the industry," as well as "conditions in the industry" and "the need to avoid serious disruption" to the Employers' "mission of delivering essential services." *Id.* at 115, 121. He observed that, "[b]y all accounts, recent

---

[24] The Arbitrator modified the award on February 25, 2022, correcting minor technical defects in the original, which issued on February 23. *See* App'x II at 68. The Arbitrator issued a supplement to the modified Second Award on March 16, 2022, further specifying the coverage periods for several Employers that are not involved here. *See* Case No. 1:20-cv-03611-JGK, Dkt. No. 212-2 at 4–5. We treat the modified award dated February 25, 2022, as the definitive Second Award here, as do the parties to this appeal.

[25] As for the four Named Employers, the Arbitrator established the following coverage periods:

- o   Alliance: June 8, 2012 to October 31, 2021;
- o   CPC: April 1, 2008 to October 31, 2021;
- o   FCP: September 2, 2010 to October 31, 2021; and
- o   UJC: June 14, 2012 to October 31, 2021.

App'x II at 118–19.

trendlines in the home health care industry are threatening its viability," and that too onerous of a remedy would accordingly risk harming the affected employees and consumers alike. *Id.* at 114–15. The remedy he chose was therefore to order the Employers jointly to create a "Special Wage Fund" comprising contributions from each calculated at a standard rate of $250 "for each home aide in its employ during all or part of a coverage period" that he would identify individually for each Employer. *Id.* at 117, 120. The Special Wage Fund—which the Arbitrator estimated would total some "$30 to $35 million," *id.* at 123—would then be drawn on to pay some amount of back pay to any individual who timely submitted a qualifying claim.

The Arbitrator set a rapid schedule for implementing the remedy. He ordered that the Employers pay into the Special Wage Fund within sixty days after the Award issued in February; that they disseminate to the Union's members a notice-and-claim form regarding the Award and the Special Wage Fund, also within sixty days; that wage claims be submitted no later than sixty days after the notice-and-claim forms are disseminated; and that claims be paid by no later than forty-five days after the deadline for claim submission—in the end, a payment deadline of approximately August 9, 2022, a bare five months after the Second Award issued.

As to the amounts to be paid, he further provided that each qualifying individual "who timely provides a claim form shall receive a minimum payment of ten ($10) dollars," with the total payment to the aide to be determined by a formula based on the nature and number of the hours worked by the claimant during the covered period. *Id.* at 125–26, 128. He also required that each employee submitting a claim execute a release that expressly acknowledged that she could not "pursue [her] claims elsewhere," and accepting that, "pursuant to [the] collective bargaining agreement and the Award," the claims "have already been decided and ruled on by the Arbitrator." *Id.* at 147.

The Union then petitioned the district court for confirmation of the Second Award. As before, no Employer opposed. Certain of the Named Appellants again moved to dismiss the Union's petition and also sought an order enjoining the Union and the Employers from complying with the Award's remedial portion by prohibiting them from disseminating the required notice forms and paying out any claims from the Special Wage Fund.[26] They pressed the view that, without the requested injunction, confirmation of the Second Award would inhibit and perhaps even preclude them altogether from pursuing their state court statutory wage claims against their Employers individually as well as on behalf of the classes they sought to represent. They also argued that their recently filed appeal of the First Confirmation Order entirely divested the district court of subject-matter jurisdiction over the Union's petition to confirm the Second Award.

In April 2022, the district court denied their motions to dismiss and for a preliminary injunction. *1199SEIU United Healthcare Workers E. v. PSC Cmty. Servs.*, 597 F. Supp. 3d 557, 563 (S.D.N.Y. 2022) (the "Preliminary Injunction Order"). First, the district court found the motions improperly filed, observing that some of the movants were not named parties to the pending district court case and had not sought to intervene in that case. *See id.* at 566–67. It observed, too, that seven of the twelve movants had been "expressly carved out of and [were] not bound" by the First and Second Awards.[27] *Id.* at 566. The district court also ruled that the movants lacked standing to pursue the

---

[26] These are, once again, Appellants Gail Yan, Alvaro Ramirez Guzman, Elida Agustina Mejia Herrera, Leticia Panama Rivas, and Eugenia Barahona Alvarado, and Intervenors-Appellants Mei Kum Chu, Sau King Chung, Qun Xiang Ling, Epifania Hichez, Carmen Carrasco, Seferina Acosta, and Maria Diaz. *See* Case No. 1:20-cv-03611-JGK, Dkt. No. 188.

[27] These seven movants were Alvaro Ramirez Guzman, Elida Agustina Mejia Herrera, Leticia Panama Rivas, Epifania Hichez, Carmen Carrasco, Eugenia Barahona Alvarado, and Seferina Acosta. *Injunction Order*, 597 F. Supp. 3d at 566 n.3.

injunction and dismissal motions because they "were not parties to the arbitration" and, echoing its earlier approach under *Katir*, because they "ha[d] not alleged that the Union breached any duties [owed to them], failed to act on the Second Award, or engaged in any fraud or deceit." *Id.* at 568.

Second, the district court concluded that the motions failed for substantive reasons. With respect to the desired preliminary injunction, the district court ruled that the movants failed to demonstrate any irreparable harm, a likelihood of success on the merits, or that the public interest would be promoted by the requested injunction. *See id*. at 570–72. With respect to the motion to dismiss, the district court ruled that the movants' pending appeal of its decision confirming the First Award did not divest it of jurisdiction to confirm the Second Award, reasoning that "the questions raised and decided" in the two actions were "distinct." *Id.* at 573. None of the movants appealed the district court's order denying dismissal, intervention, or injunctive relief.

Finally, after the appeals of the First Confirmation Order (Nos. 22-631 and 21-633) were fully briefed and scheduled for oral argument in our Court, the district court granted the Union's petition for confirmation of the Second Award. *1199SEIU United Healthcare Workers E. v. PSC Cmty. Sers.*, 608 F. Supp. 3d 50, 56 (S.D.N.Y. 2022) (the "Second Confirmation Order"). Echoing its first and second intervention denials, the district court again rejected the motions to intervene and to vacate the Second Award to the extent requested by the movants: that is, insofar as it purported to preclude them and all other Pre-2015 MOA Employees from pursuing wages due to them and related relief in state court.[28] *Id*. Stating largely the same reasons as given in its First

---

[28] Intervention in the Second Award confirmation proceedings and vacatur of the Second Award were sought by Appellants Gail Yan, Alvaro Ramirez Guzman, Elida Augustina Mejia Herrera, Leticia Panama Rivas, Eugenia Barahona Alvarado, Rafaela Cruceta, Virtudes Duran, Wai Kam Lou, Yue Ming Wu, and Cui Ying Mai; and Intervenors-Appellants Mei Kum Chu, Sau King

Confirmation Order and in the Preliminary Injunction Order, the district court found that the movants lacked standing to intervene and also failed to satisfy Rule 24, "moot[ing]" their motion to vacate the Second Award. *Id.* at 60–65, 66 n.7. And concluding once again that the movants through the Union had "evince[d] a clear consent to arbitrate and delegate questions of arbitrability to the arbitrator" in both the 2012 CBA and the 2015 MOA, the district court determined in the alternative that their motion to vacate was meritless. *Id.* at 68. Then, on deferential review, the district court rejected the proposed grounds for denial of confirmation and confirmed the Second Award.

The movants timely appealed this judgment, opening **No. 22-1587**, the third appeal before us now**.**[29] We consolidated these three appeals for the purposes of this decision.

When we heard oral argument, the Union's counsel advised that the Special Wage Fund had been entirely paid out to claimants and that the claims process was now closed. Oral Arg. Tr. at 30:23–25. Our decision in these three cases thus affects only the rights of the Named Appellants to proceed in state court on their own wages claims or, as may be permitted by the state courts, in class actions representing similarly situated Pre-2015 MOA Employees of the Named Employers—CPC, FPC, UJC, or Alliance.

---

Chung, Qun Xiang Ling. *See* Case No. 1:20-cv-03611-JGK, Dkt. Nos. 241, 244 (April 26, 2022). These thirteen movants were all former employees of CPC, FCP, or Alliance.

[29] Appellants Gail Yan, Alvaro Ramirez Guzman, Elida Agustina Mejia Herrera, Leticia Panama Rivas, Eugenia Barahona Alvarado, Rafaela Cruceta, Virtudes Duran, Wai Kam Lou, Yue Ming Wu, and Cui Ying Mai; and Intervenors-Appellants Mei Kum Chu, Sau King Chung, and Qun Xiang Ling filed notices of appeal. *See* Case No. 1:20-cv-03611-JGK, Dkt. No. 264.

## DISCUSSION

The questions presented fall into two distinct sets. The first set concerns whether the district court erred in denying intervention to the Named Appellants in either or both of the Award confirmation proceedings. The second concerns, more substantively, whether the district court erred in confirming either Award insofar as the Award purported to cover one or all of the Named Appellants and, potentially, other similarly situated Pre-2015 MOA Employees of the Named Employers. For the reasons set forth further below, we identify error in both sets of rulings.

## I.     The Named Appellants had standing and were entitled to intervene.

We review a district's denial of a motion to intervene for abuse of discretion. *U.S. v. City of New York*, 198 F.3d 360, 364 (2d Cir. 1999). A district court abuses its discretion when its decision rests on a clearly erroneous factual finding or an error of law. *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001). We will also find an abuse of discretion when we conclude that the district court's decision does not fit within "the range of permissible decisions." *Id.*

### A.  Applicable law

Federal Rule of Civil Procedure 24(a) directs that, on timely motion, the district court must permit anyone to intervene who:

> (1) is given an unconditional right to intervene by a federal statute; or
>
> (2) claims an interest relating to the property or transaction that is the subject of the action, and [3] is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, [4] unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a) (bracketed numbers added). An "interest" cognizable under Rule 24(a)(2) is one that is "direct, substantial, and legally protectable." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 129 (2d Cir. 2001). An individual may not intervene as of right in

30

a pending lawsuit without satisfying each of the four prongs that we have numbered in the Rule's quoted text, above. *See Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014).

### B. The district court's decisions denying intervention

As we described above, the district court first denied intervention broadly, having concluded that the Named Appellants lacked Article III standing to intervene. In doing so, it relied primarily on our decision in *Katir*, as do the Union and Employers on appeal. *See Katir*, 15 F.3d 23. The district court pointed to our statement there that "an individual employee represented by a union generally does not have standing to challenge an arbitration proceeding to which the union and the employer were the only parties." *Id*. at 24–25. Only if the employee plausibly claims that the union breached its statutory duty of fair representation with regard to the employee does she have standing to participate in the arbitration, we wrote. *Id*. Thus, since the Named Appellants "ha[d] not made such allegations," the district court concluded, under *Katir* they lacked standing to intervene. *First Confirmation Order*, 520 F. Supp. 3d at 599.

The district court also determined that the Named Appellants' intervention motions under Rule 24(a) failed on the merits. The Named Appellants failed to "assert[] an interest" in the confirmation action, the district court said; they also failed plausibly to allege that they are "so situated that without intervention the disposition of the action may . . . impair or impede [their] ability to protect [their] interest" or that the interest they asserted is "not adequately represented by the other parties." *U.S. v. Pitney Bowes*, 25 F.3d 66, 70 (2d Cir. 1994) (construing Fed. R. Civ. P. 24(a)). The district court found the Named Appellants' argument that "confirmation of the Award[s] may impair their ability to assert their claims in state court" described a possible harm that was "too contingent or remote to be cognizable under Rule 24." *First Confirmation Order*, 520 F. Supp. 3d at 600. Their sole cognizable interest in the confirmation proceedings, it

31

thought, was "their potential entitlement to compensation for potential violations of labor laws or the terms of the CBA." *Id.* This interest, in the district court's view, would be "adequately represented" by the Union, dooming the Named Appellants' claim that it would be "impaired without their intervention." *Id.*

In both of these legal conclusions, we conclude, the district court was mistaken. The Named Appellants had Article III standing to intervene and their intervention motions under Rule 24(a) did not fail on the merits.

C. The Named Appellants have standing to intervene

We have long held that non-parties to an arbitration have Article III standing to intervene in a confirmation proceeding regarding that arbitration if they can demonstrate a "sufficient stake in the outcome." *Ass'n of Contracting Plumbers. v. Loc. Union No. 2 United Ass'n of Journeymen & Apprentices*, 841 F.2d 461, 467 (2d Cir. 1988) (internal quotation marks omitted). The Named Appellants have shown a sufficient stake in the outcome here: they have demonstrated that the First Award, when confirmed, would compel them either to arbitrate their claims in the Union's grievance proceedings before the Arbitrator, effectively requiring them to abandon their pending state court actions or to arbitrate the claims the classes they seek to represent.[30] And the Second Award, once confirmed, restricted their potential recovery. The district court's decisions confirming the two Awards therefore affected the Named Appellants in "a

---

[30] Thus, because seven of the Named Appellants whom the Arbitrator excluded by name from the Awards' binding effect—Alvaro Ramirez Guzman, Elida Augustina Mejia Herrera, Leticia Panama Rivas, Epifania Hichez, Carmen Carraso, Seferina Acosta, and Eugenia Barahona Alvarado—each seek to represent a class in a state court action, they, too, have shown a sufficient stake in the outcome to warrant intervention.

32

sufficiently substantial and concrete manner as to confer standing to move to set them aside." *Id.* at 466.[31]

Our decision in *Katir* is fully consistent with this determination. In that case, an employee represented by a union, Katir, was fired by her employer for falsifying time sheets. *Katir*, 15 F.3d at 24. Katir's union proceeded on her behalf in an arbitration challenging her dismissal, invoking the arbitration clause of the CBA in effect during her employment and arguing that her dismissal violated the CBA's "just cause" provision. *Id.* After the arbitrator ruled in favor of the employer, finding sufficient cause for the dismissal, Katir then sued the employer in state court, independent of the Union, in an effort to challenge her termination and the arbitrator's award.

The district court awarded summary judgment to the employer, which had removed the action to federal court under Section 301 of the LMRA, 29 U.S.C. § 185, finding that Katir lacked standing to challenge the arbitration award. *Id.* We affirmed, explaining that "[i]f there is no claim that the union breached its duty of fair representation, an individual employee represented by a union generally does not have standing to challenge an arbitration proceeding to which the union and the employer were the only parties." *Id.* at 24–25. Because Katir was not herself a party to the arbitration and did not allege that the union breached its duty of fair representation to

---

[31] Indeed, at an earlier stage of the proceedings in our court, the Union argued that the Named Appellants lacked Article III standing even to *appeal* the First Confirmation Order, urging dismissal of the appeal on that ground. We denied the motion and found standing, reasoning that "one or more of the Appellants in that proceeding have made a threshold showing that they have interests plausibly affected by the judgment," and that no more was required to pursue the appeal on behalf of all similarly situated individuals. No. 21-633, ECF No. 55 (citing *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 239 (2d Cir. 2013)). We explained in *NML Capital* that "where the non-party has an interest plausibly affected by the judgment," it may have Article III standing to appeal. 727 F.3d at 239. The same "plausibly affected" interests that conferred on the Named Appellants standing to appeal also conferred standing to intervene in the district court confirmation proceedings with regard to the First Award.

33

her in the arbitration, we reasoned, she was not entitled to sue the employer independently. *Id*. at 25.

Here, the Union properly concedes that those of the Named Appellants who were no longer employed by their respective Employers by the end of 2015 were not members of a covered bargaining unit when it executed the 2015 MOA. Oral Arg. Tr. at 38:4–5.[32] And the Union does not contend that the Named Appellants' statutory wage claims were initially covered by the 2012 CBA's grievance and arbitration procedure. *Id.* at 32:19–21. Unlike in *Katir*, then, insofar as the Named Appellants were no longer employed by an Employer at the end of 2015, when the 2015 MOA took effect, the Union had no free-standing duty to represent them concerning statutory wage claims in 2019 when the Union filed its class-action grievance and launched the mandatory arbitration that is the subject of these appeals. *See Green v. Dep't of Educ. of City of New York*, 16 F.4th 1070, 1075 (2d Cir. 2021) ("A union's statutory duty of fair representation traditionally runs only to the members of its collective-bargaining unit[.]" (quoting *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 376 n.22 (1984))).

The district court expressed concern that, were it to grant the intervention motion, union members could opportunistically quit their employment and union membership at the last moment before a union took action, and then sue independently, regardless of the union's fair representation of their interests, if the employee anticipated that the Union would be on the receiving end of an unwelcome adverse

---

[32] Proceeding before the Arbitrator, however, the Union took the position that any distinction between Pre-2015 MOA Employees and non-Pre-2015 MOA Employees was "artificial [and] illusory," asserting that employees in the industry frequently leave one employer to work for another and thus remain in a covered bargaining unit despite having left a particular job. App'x I at 56. As a general matter, this may well be true. But it is beside the point: the Named Appellants here each attest that they did not work for another Employer after the end of their employment with their respective Employers, and the Union, as we have explained, does not uniformly contest these representations. Our discussion, then, is limited to employees who were not employed by an Employer when the 2015 MOA was executed.

outcome. Such a rule, the district court reasonably warned, "would essentially allow Union members to opt-out of their obligations under a collective bargaining agreement by simply withdrawing from their union prior to bringing suit," *First Confirmation Order*, 520 F. Supp. 3d at 607 (internal quotation marks omitted), and undermine the collective bargaining process. But this concern was misplaced in the markedly different circumstances presented here. The Named Appellants' statutory wage claims were never covered by the CBA in effect during their employment, as we describe below, nor were they covered—except perhaps by an employee's consent, express or implied—by the 2015 MOA, executed after they left their employment, well before December 2015. And, contrary to the district court's concern, the record does not reflect that the Named Appellants abandoned ship barely moments before the 2015 MOA was signed, seeking a better deal elsewhere; it appears that virtually all of them had left their respective bargaining units months if not years before the 2015 MOA's execution. Some had done so as early as 2012.[33]

True, the Named Appellants' underpayment claims accrued when they were represented by the Union. But since the 2015 MOA's mandatory arbitration clause was not yet in effect, they were free to file suit on their statutory claims—including through a class action filed in state court. Also true, as we explain at greater length below, the Named Appellants could have consented to have the Union represent them in the 2019 arbitration. But no party claims that they did. Further, the Named Appellants sought to

---

[33] According to their affidavits and other documents submitted in the district court, Gail Yan left her bargaining unit in June 2014; Alvaro Ramirez Guzman in August 2014; Elida Augustina Mejia Herrera in September 2015; Leticia Panama Rivas in June 2015; Eugenia Barahona Alvarado in August 2015; Rafaela Cruceta in April 2015; Virtudes Duran in 2012; Wai Kam Lou in February 2014; Yue Ming Wu in December 2015; Cui Ying Mai in September 2014; Mei Kum Chu in October 2013; Sau King Chung in January 2013; Qun Xiang Ling in June 2015; Epifania Hichez in April 2014; Carmen Carrasco in December 2015; Seferina Acosta in April 2014; and Maria Diaz in August 2012. Except as noted above, the Union largely does not dispute these representations.

35

pursue individual statutory rights that existed independent of the CBA, not rights such as a just-cause termination provision, which arises solely by virtue of the CBA. *Katir* is therefore inapposite.

    D.  <u>The Named Appellants were entitled under Rule 24(a) to intervene in the confirmation proceedings</u>

Proceeding to the merits of the Named Appellants' motions to intervene, we conclude that they satisfied Rule 24(a), "Intervention of right." Fed. R. Civ. P. 24(a).

First, the Named Appellants' "interest" lies not merely in possibly obtaining compensation for the Employers' asserted violations of statutory wage laws, as the district court concluded: it is in having their statutory wage claims addressed and resolved in a judicial, rather than arbitral, forum. This is not "simply a personal preference," as the Union characterizes it, Appellee's Br. at 16, but rather a cognizable legal difference, *see Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 80–81 (1998). If confirmed as to the Named Appellants, the First and Second Awards would divest state and federal courts alike of jurisdiction to hear their statutory wage claims. Yet both the NYLL and FLSA expressly establish private rights of action for employees to pursue relief for alleged statutory violations affecting them, *see* N.Y.L.L. § 198(1-a); 29 U.S.C. § 216(b), and state and federal courts have consistently held that employees have a right to assert such claims in a judicial forum, absent a "clear and unmistakable" waiver, *see Sanchez v. Clipper Realty, Inc.*, 638 F. Supp. 357, 368 (S.D.N.Y. 2022) (NYLL and FLSA); *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019) (FLSA) (citing *Wright*, 525 U.S. at 79–80).

The Named Appellants contend that they did not clearly and unmistakably waive their right to assert their wage claims in a judicial forum. To the contrary, they urge, because they were no longer employees of an Employer or members of a bargaining unit in December 2015, the Union was not authorized to act on their behalf

36

when it executed the 2015 MOA and purported to waive that right to a judicial forum. Indeed, this is the crux of the Named Appellants' argument on the merits: that the Awards cannot bind them and, therefore, neither should have been confirmed as to them nor should prevent them from proceeding on their own (and perhaps as part of a class's) wage claims in state court.

Recognizing the Named Appellants' interest in enforcing these rights in a judicial forum leads us to the further conclusion that the Union did not—and could not— "adequately represent[]" that interest. *Pitney Bowes*, 25 F.3d at 70. In this regard, in fact, the Union's and the Named Appellants' interests are directly adverse: the Union sought to (and under the 2015 MOA, had to) arbitrate its members' wage claims, whereas the Named Appellants seek to assert their own wage claims in state court, perhaps in the hope of a obtaining a more tailored and more fully compensatory award. Indeed, in an independent state court action, they and their counsel can argue more directly about the damages owed to a particular claimant and better tailor any settlement to the interests and wrongs suffered by that individual claimant. Settlement possibilities, too, may look quite different with respect to one employer than another, as the Arbitrator recognized in the Second Award.[34]

The district court wrote that the Union and the Named Appellants "have the same ultimate objective." *First Confirmation Order*, 520 F. Supp. 3d at 600 (quoting *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179 (2d Cir. 2001)). But, except at the most

---

[34] "Were individual hearings to be held upon each employee's claim, underpayments would be awarded in varying amounts," the Arbitrator acknowledged. App'x II at 114. But faced with the practical realities of the situation, and recognizing that it would be "impractical, if not impossible," to conduct a separate hearing on each individual claim, *id.*, the Arbitrator directed instead that, generally, "the [Special Wage] Fund shall be allocated sixty (60%) percent to 24-hour shift claims and forty (40%) percent to total hours inclusive of 24-hour shifts," with a "fifteen (15%) percent enhancement . . . added to the 24-hour shifts and total hours for the portion of the coverage period ending December 31, 2015," *id.* at 124.

37

abstract level—to obtain some compensation for unpaid wages and damages for legal violations, perhaps—we are not confident in the accuracy of this characterization. So we cannot accept the district court's conclusion that the Named Appellants failed to demonstrate that the Union could not adequately represent their interests. Rather, we conclude that the Named Appellants have shown that a district court order confirming the Awards would, "as a practical matter, impair or impede" their "ability to protect [their] interest" in asserting their claims in a judicial forum, as Rule 24(a) requires. *Pitney Bowes*, 25 F.3d at 69–70. The Named Appellants therefore stated a "direct, substantial, and legally protectable" interest in intervening in the confirmation proceedings both as to the First and Second Awards. *Brennan*, 260 F.3d at 129. The district court was mistaken in concluding otherwise and refusing their Rule 24(a) motion to intervene as of right.

**II.     The district court erred in confirming the Awards insofar as they purported to bind the Named Appellants.**

In reviewing the Named Appellants' challenge to the district court's confirmation of the arbitration Awards, we face three nested layers of inquiries, as the Supreme Court explained in *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995).

At the innermost level lies the core "merits" question—that is, who is liable to whom for what? In the cases before us now, we ask whether the Employers violated the statutory wage laws and owe back wages to the Named Appellants.

Before reaching that core question, however, we consider the "arbitrability" question: did the parties agree to submit their merits question to an arbitrator? We ask whether the Named Appellants (as distinguished from those still employed and in a bargaining unit when the 2015 MOA took effect), or the Union acting properly on their

38

behalf, agreed with the Employers that the core merits question of statutory violations and unpaid wages would be resolved by an arbitrator, not by a court.

At the outermost level, before either of these inquiries, lies a threshold question, the "who decides" question: did the parties agree that an arbitrator would decide *whether* the parties agreed to arbitrate their merits question, or did they leave that to a court to decide? Here, that question is whether the Union, acting properly on behalf of the Named Appellants, and the Employers decided that an arbitrator would determine whether they agreed to arbitrate their statutory wage claims, or, rather, did they leave it to the default: that a court would decide.

We therefore first turn to the threshold "who decides" question: did the Union and the Employers agree that an arbitrator would decide whether the parties agreed to arbitrate their merits question, or did they leave that to a court to decide?

As to this question, the Union contends that, both in the 2012 CBA and the 2015 MOA, it and the Employers delegated this gateway question to the arbitrator. The Arbitrator and district court concurred. The Named Appellants, however, argue that the 2012 CBA did not cover their statutory wage claims at all and that the 2015 MOA did not bind them because it was executed after they had stopped working for any of the Employers and were no longer members of the bargaining unit. The Union was then not legally authorized to enter any agreement on their behalf as to their statutory wage claims, they say.

On *de novo* review, we conclude that the Named Appellants have the better argument: neither the 2012 CBA nor the 2015 MOA reflects a "clear and unmistakable" agreement by the Union and the Employers to delegate resolution of the threshold question of arbitrability of their merits question, that is, their statutory wage claims, to an arbitrator. The district court erred in ruling otherwise.

39

A. <u>The Union and the Employers did not delegate the question of arbitrability of the Named Appellants' statutory wage claims to the Arbitrator</u>

*1. Applicable law*

We observe at the outset that a district court's review of a labor arbitration award ordinarily "is narrowly circumscribed and highly deferential—indeed, among the most deferential in the law." *A&A Maint. Enter., Inc. v. Ramnarain*, 982 F.3d 864, 868 (2d Cir. 2020) (internal quotation marks omitted). The deferential review standard reflects federal policy "favor[ing] arbitration of labor disputes." *Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 377 (1974). A party seeking to vacate a labor arbitration award "bears a very high burden of showing that the award falls within one of a small number of exceptions to this general rule." *A&A Maint. Enter.*, 982 F.3d at 868 (internal quotation marks omitted).[35] One significant exception, however, and the one squarely presented here, concerns the scope of an arbitrator's authority. If an arbitrator is shown to have "exceeded [his] powers" under the arbitration agreement, courts owe no deference to the relevant portion of his decision and the award is subject to vacatur, upon application. *Id.* (quoting 9 U.S.C. § 10(a)(4)).[36]

On appeal from an order confirming an arbitration award, then, we must first assure ourselves that the arbitrator "acted within the scope of his authority." *Local 1199,*

---

[35] Arbitration awards issued pursuant to collective bargaining agreements are governed by the LMRA, but they are reviewed under essentially the same standards as those subject to the Federal Arbitration Act (FAA). *See A&A Maint. Enter.*, 982 F.3d at 869 n.2 (observing that we "substantially import[] the analysis of the FAA" when deciding whether to vacate an arbitration award in the labor context).

[36] Section 10(a)(4) of the FAA makes an arbitral award subject to vacatur "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Other bases for vacatur (and hence exceptions to the obligation of deference) require a showing of "corruption, fraud, or undue means," "evident partiality or corruption," or "misconduct." 9 U.S.C. § 10(a)(1)–(3). None of these circumstances applies here.

*Drug, Hosp. & Health Care Emps. Union, v. Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir. 1992). Arbitration is "a matter of contract," and arbitrators have authority to resolve disputes "only because the parties have agreed in advance to submit such grievances to arbitration." *Local Union 97, Int'l Bhd. of Elec. Workers v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023) (per curiam) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010)). Thus, an arbitrator's authority "is constrained foremost by [the] principle that a party cannot be forced to arbitrate any dispute that it has not obligated itself, by contract, to submit to arbitration." *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 140 (2d Cir. 2007) (internal quotation marks omitted).

Whether the parties have in fact agreed to submit a particular dispute to arbitration "is typically an issue for judicial determination," the Supreme Court has instructed. *Granite Rock*, 561 U.S. at 296 (citations and internal quotation marks omitted). In our own articulation of that general principle, we treat the question "whether the parties have agreed to arbitrate, *i.e.*, the 'question of arbitrability,' [a]s an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016); *see also DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021) ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." (internal quotation marks omitted and alterations adopted)). Without a lucid delegation, "a party resisting confirmation of an arbitration award is entitled to an independent court review of a question of arbitrability." *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012).

To resolve the "who decides arbitrability" question in these appeals, then, we look to the agreements between the Union and the Employers and to the relationship of the Named Appellants to the Union and the Employers in the relevant timeframe. We

41

"interpret collective-bargaining agreements . . . according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015); *see Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456 (1957) (holding that "the substantive law to apply in suits under [LMRA Section] 301(a) is federal law, which the courts must fashion from the policy of our national labor laws"); *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 404 (1988); *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 102 (1962). State common law principles of contract interpretation—that is, "ordinary principles of contract law"—therefore inform our analysis, so long as they tend to effectuate and are not incompatible with federal labor policy. *M&G Polymers*, 574 U.S. at 435; *see Lincoln Mills*, 353 U.S. at 457 ("[S]tate law, if compatible with the purpose of [Section] 301, may be resorted to in order to find the rule that will best effectuate the federal policy."). Because contract interpretation is a matter of law, we review the district court's ruling *de novo* and look to the Arbitrator's analysis without deference. *See Yakin v. Tyler Hill Corp.*, 566 F.3d 72, 75 (2d Cir. 2009). With these principles in mind, we turn to examining the contracts at issue here.

> 2. *Neither the 2015 MOA nor the 2012 CBA delegated the question of arbitrability to the Arbitrator*

The Union entered into several agreements with the Employers on behalf of its members in the relevant time frame. These include the 2012 CBA and the 2015 MOA, which amended the 2012 CBA. The question is whether in either agreement the Union was properly acting on behalf of the Named Appellants and, doing so, clearly and unmistakably agreed with the Employers that an arbitrator, not a court, would decide whether the Named Appellants agreed to arbitrate the disputed merits question: the

damages owed for statutory wage violations during the period before the Named Appellants left their employment.[37]

### i. The district court's decision

The district court ruled that the Union and the Employers "plainly agreed to arbitrate grievances and to delegate . . . questions of arbitrability to the Arbitrator." *First Confirmation Order*, 520 F. Supp. 3d at 606. In support, the district court pointed first to the fact that Article XXVI of the 2012 CBA incorporated by reference the Labor Rules of the American Arbitration Association (AAA). *See* AAA Rules, Amended and Effective July 1, 2013.[38] One such rule—Rule 3(a)—delegates "questions of jurisdiction and 'arbitrability' to the Arbitrator," as the district court wrote. *First Confirmation Order*, 520 F. Supp. 3d at 606. The district court also cited the 2015 MOA, whose terms it found "clarified that grievances relating to [statutory wage claims] must be arbitrated." *Id.*

---

[37] To be sure, the parties to the 2012 CBA—that is, the Union and the Employers—have taken the position that they did, in fact, intend to delegate the question of arbitrability to the arbitrator in that agreement. But this does not resolve the question before us. To begin with, we look to the language of the agreement itself to determine the parties' intent, not to their representations years later. *See Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1210 (2d Cir. 2002) ("It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence."). And in any event, the issue before us is whether the 2012 CBA so "clearly and unmistakably" delegated the question of arbitrability that the Named Appellants, as members of the bargaining unit, can be said to have assented to waiving their rights to proceed in a judicial forum by ratifying the agreement. *See DDK Hotels*, 6 F.4th at 317 (internal quotation marks omitted). Even were we to credit the Union's and Employers' retrospective representations as to their intent, their own understanding of the 2012 CBA would not resolve that issue.

[38] The record does not contain a complete copy of the AAA Rules in effect in the relevant period. We may take judicial notice of their published version, however, because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). They are available at https://www.adr.org/media/wgvdxucs/2026_laborrules_web.pdf (accessed July 7, 2026). These Rules have not been amended since 2013.

Taken together, the district court concluded, the reference in the 2012 CBA to the AAA rules and the 2015 MOA "evince a clear consent to arbitrate and delegate questions of arbitrability to the arbitrator." *Id.* at 608. The district court did not distinguish between the effect of these agreements on the rights of employees who worked for an Employer when the 2015 MOA became effective and those who had departed before then—that is, the Pre-2015 MOA Employees.

To be sure, the underlying claims at issue here accrued when the Named Appellants were working for their respective Employers and were thus represented by the Union. The Union and the Employers could have decided expressly to delegate the arbitrability question regarding past accrued claims as well as future such claims to the Arbitrator in the 2012 CBA or the 2015 MOA, taken together or separately. As we have explained, however, because the question of arbitrability is presumptively a judicial decision, our case law has set a higher bar, requiring that the parties make a "clear[] and unmistakabl[e]" agreement to delegate the initial question of arbitrability to an arbitrator, serving the interests of unions, their members, and employers alike. *Nicosia*, 834 F.3d at 229. And in the end, we comfortably conclude that the stringent standard was not satisfied here.

> ii.      The 2012 CBA

We look first to the 2012 CBA, which undisputedly was binding on the Named Appellants, all of whom the parties agree were employed by an Employer and were members of the Union when the agreement was entered into in 2012, to see whether it clearly and unmistakably delegated the arbitrability question to the Arbitrator.

As discussed above, Article XXVI of the 2012 CBA laid out a process for resolution of "grievances." App'x I at 119. Article XXVI defined a "grievance" as "any dispute between the Union (on its behalf and/or on behalf of any Employee) with the Employer involving the proper application, interpretation, or compliance with the

44

specific written provisions of the Agreement based on facts and circumstances occurring during the term of th[e] Agreement." *Id.* And it declared that a grievance "is subject to arbitration" under "the Labor Arbitration Rules of the American Arbitration Association." *Id.* at 119–20. Rule 3(a) of the AAA Rules then provided: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *Id.* at 53; *see* AAA Rule 3(a).

As we said in *DDK Hotels*, an agreement's incorporation by reference of rules such as these, which "explicitly empower an arbitrator to resolve questions of arbitrability," is "relevant in evaluating whether there is clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." 6 F.4th at 318. But, as we emphasized there, such a generic rule-incorporation provision does not *per se* qualify as clear and unmistakable evidence of the requisite intent: rather, "context matters." *Id.* Even where an arbitration agreement contains such a general rule-incorporation provision, it may elsewhere be "narrow[], vague, or contain[] exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes." *Id.* at 319. In such circumstances, we explained, the agreement's "incorporation of rules that empower an arbitrator to decide issues of arbitrability, standing alone, does not suffice to establish the requisite clear and unmistakable inference of intent to arbitrate arbitrability." *Id.* Applying this approach in *DDK Hotels*, we concluded that the arbitrability question there remained for the district court to decide, despite the agreement's incorporation of a rule set generally providing that the question was for the arbitrator. *See id.* at 321.

Here, several provisions of the 2012 CBA place its reference to the AAA Rules in important context. Most importantly, Article XXVI defines a "grievance" subject to arbitration in a limited way: it is "any dispute between the Union . . . [and] the

45

Employer involving the proper application, interpretation, or compliance with the specific written provisions *of the Agreement.*" App'x I at 119 (emphasis added). It does not assign an open-ended meaning to the term: a "grievance" arises under solely the terms and conditions of work negotiated in the CBA, not otherwise. The Union and Employers thus "consented to arbitrate only a limited subset of disputes" in Article XXVI, *DDK Hotels*, 6 F.4th at 319—that is, those "involving the proper application, interpretation, or compliance with" the CBA, App'x I at 120. And, as the Union and the Employers both now concede, the CBA does not make express reference to any statutory claims, never mind the wage claims under FLSA and the NYLL pursued here by the Named Appellants. *See* Oral Arg. Tr. at 32:19–21. For a CBA's mandatory arbitration clause to be read as encompassing statutory claims, which do not arise by virtue of the CBA, we have explained that it must contain "specific references . . . either to the statutes in question or to statutory causes of action generally." *Lawrence v. Sol G. Atlas Realty Co.*, 841 F.3d 81, 84 (2d Cir. 2016). So, in the absence of explicit reference to those statutes, a statutory wage-and-hour claim, including one based on FLSA, the NYLL, or local law, does not constitute a "grievance" under Article XXVI.

We conclude, then, that Article XXVI's general reference to the AAA Rules did not constitute a clear and unmistakable delegation of the question of the arbitrability of the Named Appellants' statutory wage claims to the Arbitrator. *See id.* at 85.

### iii. The 2015 MOA

Nor did the 2015 MOA clearly and unmistakably delegate the arbitrability question to the Arbitrator, even assuming that it might bind individuals who were no longer in a bargaining unit when it was adopted.

Most critically, with regard to the threshold "who decides" arbitrability question for statutory wage claims, the 2015 MOA made no explicit provision at all; it is silent on the question. As the Supreme Court has explained, an arbitration agreement's "silence

46

or ambiguity" regarding this threshold question "reverses the presumption" in favor of arbitrability. *First Options*, 514 U.S. at 944–45. The question of arbitrability is then for a court—not an arbitrator—to resolve. *Id.* Thus, while "[a]s to . . . the *scope* of the arbitration agreement, we normally resolve any doubts in favor of arbitration," we have recognized that "an exception to the scope presumption applies in the context of a union's waiver of its members' right to bring statutory claims in court." *Abdullayeva*, 928 F.3d at 222 (emphasis in original; internal quotation marks omitted). As stated above, that waiver "must be clear and unmistakable"; silence and vague references will not suffice. *Id.* (internal quotation marks omitted); *see also DDK Hotels*, 6 F.4th at 317 ("Where, by contrast, the question is *who* should decide arbitrability, there is a presumption that the question should be resolved by the court." (emphasis in original)). Otherwise, the Supreme Court has warned, we would risk "forc[ing] unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *First Options*, 514 U.S. at 945. This would contravene "the fundamental tenet of law that only by agreeing to arbitrate does a person surrender the right of access to a court for the resolution of a legal dispute." *DDK Hotels*, 6 F.4th at 318 (internal quotation marks omitted). So we cannot conclude that the 2015 MOA "clearly and unmistakably" delegated the "who decides" question to the Arbitrator, even were we to assume that it could bind them on accrued claims well after the termination of their employment.

Urging a contrary conclusion, the Union and Employers argue that the 2015 MOA, which was cast as a new article of the 2012 CBA, incorporated the AAA Rules as stated in the 2012 CBA and thereby sufficiently signaled that the parties agreed to commit all "who decides" questions arising under the 2015 MOA to the Arbitrator. This strikes us as unlikely. The 2015 MOA provides—without any reference to the AAA Rules—that "all claims brought by either the Union or Employees, asserting violations

47

of or arising under the Fair Labor Standards Act . . . , New York Home Care Worker Wage Parity Law, or New York Labor Law . . . , in any manner, shall be subject exclusively, to the grievance and arbitration procedures described *in this Article*"—that is, the ADR Article. App'x I at 145 (emphasis added). So, by its own terms, the 2015 MOA appears to have forbidden reliance on the AAA Rules and not embraced the 2012 CBA grievance procedures' incorporation of them. Instead, it presents itself as standing alone in the amended CBA with regard to the parties' management of claims arising from the covered wage-and-hour statutes.

Even if the 2015 MOA had expressly adopted the 2012 CBA provision that incorporated the AAA Rules, the MOA and CBA read together would still be at best ambiguous on the "who decides" question. The resolution procedures set forth in the ADR Article differ in several respects from those established by the AAA Rules in effect in 2015, when the parties signed the MOA. Unlike the AAA Rules, for example, the ADR Article required the parties to mediate a dispute before submitting it to arbitration. It also established specific timelines for managing the arbitral processes that it prescribed. It required, for example, that a party request mediation "no more than thirty (30) calendar days following exhaustion of the grievance procedure," App'x I at 145, and "submit its demand for arbitration . . . within four (4) months" of the mediation's conclusion, *id.* at 146. The AAA Rules impose no such requirements.

In this way, the ADR Article (and thus the 2015 MOA) expressly contemplated that procedures other than or in addition to those prescribed by the AAA Rules would govern the parties' arbitration of statutory wage claims. Even if the 2015 MOA is read as also incorporating the AAA Rules (by not expressly disclaiming their adoption by the 2012 CBA), such claims would in effect be subject to two different sets of rules for resolution. The "presence of both" would "create[] an ambiguity," which, "under *First Options*, requires us to assign questions of arbitrability to the district court, not the

48

arbitrator." *Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002) (per curiam) (citing *First Options*, 514 U.S. at 944).

For these reasons, we conclude that neither the 2012 CBA nor the 2015 MOA "clearly and unmistakably" delegated the question of the arbitrability of the Named Appellants' statutory wage claims to the Arbitrator.[39] That question was therefore assigned for judicial determination. We address it next.

### B. The Named Appellants did not agree to have the Union arbitrate their statutory wage claims

Having concluded that the CBA and 2015 MOA "evinced a clear consent to arbitrate and delegate questions of arbitrability to the Arbitrator," *First Confirmation Order*, 520 F. Supp. 3d at 608, the district court did not review *de novo* the Arbitrator's ruling that the wage claims of the Pre-2015 MOA Employees, including those of the Named Appellants, were arbitrable, without differentiation from the claims of employees who remained in a covered bargaining unit. Doing so now, we observe first that neither the Union nor the Employers contend on appeal that the Named Appellants' wage claims were arbitrable "grievances" under the 2012 CBA. The question, then, is whether the Union and the Employers agreed in the 2015 MOA to authorize the Arbitrator to decide the accrued statutory wage claims of the Named

---

[39] Application of New York state law, too, leads to the same outcome. As we describe above, in litigation brought by the Named Appellants, New York appellate courts have squarely held that the MOA "does not 'clearly and unmistakably' delegate the determination of arbitrability to the arbitrator." *Hichez*, 117 N.Y.S.3d at 216; *see also Guzman*, 2019 WL 1502944, at *3 (same); *Lorentti-Herrera*, 104 N.Y.S.3d 103 (same); note 17, *supra* (listing cases). The *Hichez* court, for instance, reasoned that its result was required by the observation that the 2015 MOA "neither incorporates the arbitration procedures of CBA article XXVI nor adopts the procedural rules of the American Arbitration Association." 117 N.Y.S.3d at 216. In applying state law, absent a ruling by the state's highest court, "we are generally obliged to follow the state law decisions of state intermediate appellate courts." *Pentech Int'l, Inc. v. Wall Street Clearing Co.*, 983 F.2d 441, 445 (2d Cir. 1993).

Appellants—and if they did, whether they had the authority themselves to do so. Proceeding *de novo*, we conclude that they both did not agree to such an authorization and could not have done so.[40]

### 1. *Applicable law*

Once it has been duly recognized as the employees' exclusive bargaining agent, a union has a well-recognized and broad authority to enter into collective bargaining and other agreements with employers on behalf of its bargaining unit members. 29 U.S.C.

---

[40] We recognize that no party took the position before the Arbitrator that the claims of Pre-2015 MOA Employees were not arbitrable. *See* App'x I at 66–67, 76–77. Even so, the Arbitrator considered the question, and his decision that the claims were arbitrable was largely based on the district court's ruling in *Chan v. Chinese-American Planning Council Home Attendant Program, Inc.*, No. 15-cv-9605-KBF, 2016 WL 11795816 (S.D.N.Y. Feb. 3, 2016). There, the district court rejected the plaintiffs' argument that the 2015 MOA could not apply retroactively to claims that accrued before its execution, reasoning that "in the absence of a provision placing a temporal limitation on arbitrability, an arbitration provision may cover claims that accrued prior to the execution of the agreement to arbitrate." *Id.* at *2 (citing *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98–99 (2d Cir. 1999)). The Arbitrator, adopting this reasoning, determined that his jurisdiction "extend[ed] to all claims encompassed by the Union's grievance, irrespective of whether employment ended before the effective date of the ADR Provision," since the Union and the Employers "provided arbitration as their exclusive forum for resolving all claims arising under the covered statutes . . . without limitation as to whether the claims accrued before or after adoption of their ADR Provision." App'x I at 79.

But our decision in *Smith/Enron*, relied on in *Chan* and by the Arbitrator, is inapposite. There, we held that parties to an arbitration agreement could agree to include within the agreement's scope claims arising before its execution. *Smith/Enron*, 198 F.3d at 98–99. As we explain below, however, the question here is not whether the Union and the Employers could, as a general matter, agree retroactively to arbitrate claims accruing before the 2015 MOA was executed. Rather, the question is whether the Union had authority to act on behalf of those employees who left their bargaining unit by the time of the 2015 MOA's execution—that is, the Pre-2015 MOA Employees. Moreover, *Smith/Enron* preceded the Supreme Court's decision in *Granite Rock Company v. International Brotherhood of Teamsters*, 561 U.S. 287 (2010), as we recognized in *Niagara Mohawk*, 67 F.4th at 114. Thus, insofar as *Smith/Enron* relied on a " 'presumption of arbitrability' that can 'only [be] overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,' " *id*. at 114 (quoting *Smith/Enron*, 198 F.3d at 99), it "cannot be good law," *id.* The Arbitrator's decision, while reasonable, is therefore ultimately unpersuasive.

§ 159(a); *see 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 255–56 (2009). Broad as it is, however, that authority "traditionally runs only to the members of [a union's] collective-bargaining unit, and is coextensive with its statutory authority to act as the exclusive representative for all the employees within the unit." *Schneider*, 466 U.S. at 376 n.22. So, the Supreme Court has explained, as for individuals who are "not members of the bargaining unit," such as retirees, a union "is under no statutory duty to represent them in negotiations with the employer." *Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n.20 (1971).

But this does not mean that a union may never represent former members: the Supreme Court has instructed that "nothing" in federal labor law "precludes" such representation in appropriate circumstances. *Id.*; *see also Republic Steel Corp. v. Maddox*, 379 U.S. 650, 653 (1965) (reasoning that disabling the union from acting on the employee's behalf "would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements" (quoting *Local 174, Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 103 (1962))).

Still, the boundaries of a union's possible authority and duty to represent former members are undetermined in our Circuit. A few of our sister Circuits, however, recognizing that "[a] union's representative authority does not automatically extend to its former members," *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1271 (5th Cir. 1990), have considered the question. These courts have allowed that "[u]nions *may* bargain on behalf of former [members]," but only under certain circumstances. *Id.* at 1270 (alteration incorporated; emphasis added) (quoting *Merk v. Jewel Cos.*, 848 F.2d 761, 766 (7th Cir. 1998)). A union may do so, for example, when it can provide "some evidence that [the] past members expressly or impliedly authorized the union to proceed in their behalf," and when the representation would be consistent with federal labor policy. *Meza*, 1262 F.2d at 1271; *see also Merk*, 848 F.2d at 766 (explaining that, in accordance

51

with federal labor policy, "unions may bargain on behalf of [former members] if the employer is willing, although the [former members] need not accept the offer of representation"); *Cleveland Elec. Illuminating Co. v. Util. Workers Union of Am.*, 440 F.3d 809, 817 (6th Cir. 2006) (holding that "[a] union must obtain the assent of [former members] before purporting to represent them at arbitration," based on the "dangers in failing to require the Union to obtain th[eir] . . . consent").

These Circuits have accordingly used a heavily fact-dependent analysis in determining whether a former bargaining unit member authorized, expressly or impliedly, a union to continue to represent her and act on her behalf and whether such representation would be consistent with federal labor policy. *See, e.g.*, *Meza*, 908 F.2d at 1271 n.9 (rejecting the "conclusion that former union members must always be bound by the actions of the union in order to maintain the integrity and viability of labor-management relationships" and explaining instead that "a provision expressly authorizing the union to represent past employees could be negotiated as a term of the collective bargaining agreement"); *Cleveland Elec. Illuminating Co.*, 440 F.3d at 817–18 (adopting rule that a union must "obtain [former members'] consent" in order to represent them in arbitrations because, otherwise, the former members could "lose their rights to pursue their claims directly").

What's more, as we have explained above, when interpreting CBAs we may consult applicable state law "to find the rule that will best effectuate . . . federal [labor] policy." *Lincoln Mills*, 353 U.S. at 457. And, looking at the 2012 CBA and the 2015 MOA, New York appellate courts—as we observed in a 2023 summary order and highlighted above—have uniformly ruled that the Named Appellants were "not bound by the arbitration terms of a CBA addendum when they were 'no longer defendant's employees when it was executed, they were not parties to that agreement, and there is no evidence that the [u]nion' executing the agreement 'was authorized to proceed on

52

their behalf.' " *Sanchez v. Clipper Realty, Inc.*, 22-2917-cv, 2023 WL 7272062, at *1 (2d Cir. Nov. 3, 2023) (summary order) (quoting *Konstantynovska*, 103 N.Y.S.3d at 365); *see Lorentti-Herrera*, 104 N.Y.S.3d at 104; *Hichez*, 117 N.Y.S.3d 214.

A general presumption against continued representation rights of a union vis-à-vis a former bargaining-unit member, absent a showing that the former member in some way authorized the representation, strikes us as consistent with federal labor policy generally. *See M&G Polymers*, 574 U.S. at 435. A blanket rule or even presumption to the contrary, and in favor of continued representation rights, seems to us fraught: it lies in tension with the measured freedom of choice inherent in federal labor law. *See Meza*, 908 F.2d at 1271 ("Employees who are not exclusively represented by a union are free to choose whether they want the union to represent them. Implicit in this freedom to choose is the freedom to decline such representation."); 29 U.S.C. §§ 157, 159(a). But a general, rebuttable presumption against continued representation seems to us workable and fully consistent with federal labor policy.[41] We therefore adopt and apply that approach here.

### 2. *Application*

We first join our state court counterparts in concluding that the Union did not have authority to bargain on behalf of the Named Appellants and other Pre-2015 MOA

---

[41] The employment status of an individual, her membership or non-membership in the union, whether the individual was a party to a relevant agreement with the union or employer (for example, a settlement agreement), the nature of the right at issue (for example, current and future employment benefits, or retirement benefits and other accrued rights), and any relevant documented understandings between the former member and union all may bear on whether the former member can be held to have assented to continued representation by the union and thus on whether the union's agreement with an employer that affects the former member should be understood to bind her. In addition, unusual circumstances posing a risk of the hypothetical dangers pointed out by the district court, and possibly in other circumstances yet unencountered, might overcome this presumption. No such facts have been established here, so we leave these considerations for another day.

Employees when it purported to do so by adopting the mandatory arbitration clause in the 2015 MOA and treating it as retroactive to accrued statutory wage claims for individuals no longer employed by an Employer in December 2015.

The Union does not dispute that the Named Appellants were no longer members of a covered bargaining unit when the 2015 MOA was executed. Oral Arg. Tr. at 38:4–5 ("I would say that [by 2015] they are no longer members of the union"); *see also* App'x I at 93–94 (2012 CBA, defining a bargaining unit member as a "Home Health Aide" who "*is* [] employed by the Employer in the job classification of Home Health Aide" (emphasis added)). The Union does not identify any evidence extrinsic to the 2012 CBA or the 2015 MOA establishing that any individual Named Appellant authorized it to proceed on her behalf, in a collective or individual setting.

Nor do the bad faith avoidance maneuvers hypothesized by the district court appear to be present here—unlike in *Katir*, where the terminated employee took advantage of union representation while employed and, having lost an arbitration and been terminated, sought to proceed against her former employer independent of her Union. Rather, here, the record reflects that the Named Appellants generally appear to have left their employment over a period of a year before the 2015 MOA was executed and then sought to assert new statutory rights as to which the Union had no established duty of representation at the time of their departure.

We therefore conclude that the Union's agreement to arbitrate statutory wage claims in the 2015 MOA did not bind the Named Appellants. The 2015 MOA accordingly did not require the Named Appellants to arbitrate their statutory wage claims, and the Awards do not bind them. *See Niagara Mohawk*, 67 F.4th at 113. Insofar as the Awards purported to do so, the Arbitrator exceeded the scope of his authority, and partial vacatur of the Awards and their related confirmation decisions is required. *See Smarter Tools Inc. v. Chongqing SENCI Imp. & Exp. Trade Co.*, 57 F.4th 372, 382 (2d Cir.

2023) (vacating an award in part "where . . . the arbitrators exceeded their powers by determining the rights [of nonparties]" who were not bound by an arbitration agreement) (citation omitted)); *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n v. Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004) (per curiam) (same).[42]

### III.     The remedy

To summarize, we hold that the individuals whom we have referred to here as the Named Appellants—that is, both those who are identified as Appellants and Intervenors-Appellants in the case caption—were entitled to intervene in the district court proceedings.[43] They were not bound by the 2015 MOA because they were not members of a bargaining unit covered by the CBA when it was executed nor did they assent, implicitly or explicitly, to the Union's representation of them in entering the 2015 MOA. They are accordingly entitled to pursue judicial resolution of their statutory wage claims in their state court suits against their respective Named Employers—CPC, UJC, FCP, and Alliance.

The question of a proper remedy, however, is not a simple one. As we have described, these three appeals are the product of a multi-year process involving

---

[42] As to those Pre-2015 MOA Employees who neither objected to the arbitration or participated in any action in state court, or those who filed a claim and received payment under the Second Award, we understand them to have consented to the arbitration, as we explain in greater detail below, and our decision does not unsettle those claims.

[43] These are: Appellants Gail Yan, Alvaro Ramirez Guzman, Elida Agustina Mejia Herrera, Leticia Panama Rivas, Eugenia Barahona Alvarado, Rafaela Cruceta, Virtudes Duran, Wai Kam Lou, Yue Ming Wu, Cui Ying Mai, and Intervenors-Appellants Mei Kim Chu, Sau King Chung, Qun Xiang Ling, Epifania Hichez, Carmen Carrasco, Seferina Acosta, and Maria Diaz. Our decision does not apply to employees represented by the Union on and after the date that the 2015 MOA was executed. Nor does it apply to other Union members or employees of an Employer who was not a party to these consolidated appeals. We do not disturb the Awards except as to any of the named individuals here, and, insofar as a state court finds them qualified to do so, the classes that they seek to represent.

numerous independent state and federal courts actions, two arbitral rulings, and several appeals in this Court. The factual record developed through these proceedings is extensive. Even so, the precise circumstances of each Named Appellant—as well as those of the classes that they seek to represent—are not clear on this record. Most Named Appellants appear to have established that they left their employment well before the 2015 MOA was entered into; the Union charges one, however, as having ended home healthcare work before the covered period, and one as having continued to work after the 2015 MOA was signed. *See* Appellee's Br. at 31. Others, still, may have waived their right to proceed in state court by accepting a payout under the Second Award or may have let the applicable statute of limitations lapse and failed to preserve their claims. In any of these circumstances, an individual would not be entitled to recover on her statutory wage claims based on the principles we have outlined here.

In addition, our resolution raises the further question of the putative classes that certain of the Named Appellants seek to represent against one of the Named Employers in their pending state suits. From a purely logical perspective, for the reasons we have outlined, putative class members are also not prima facie bound by the 2015 MOA and the arbitration, at least as a matter of first principles: they were in the same position as the Named Appellants—except of course, and significantly, that they did not file suit in state court or seek to be excluded from the district court's confirmation proceedings. In addition, some individuals in those groups may have filed claims for payment under the Second Award and thus likely waived their rights to pursue their claims in state court. Others, however, may have declined to do so in reliance on the pendency of the state cases.

In sum, the possible factual variations as to some relevant procedural matters are manifold. The state courts in which the Named Appellants brought their actions are in our view best placed to resolve these factual and legal questions relevant to the putative

56

classes of former employees of the Named Employers, however, and will be able to do so with the benefit of a more complete record, both as to the Named Appellants and as to the classes they seek to represent: the Pre-2015 MOA Employees of the Named Employers.

We therefore VACATE the district court's judgment insofar as it confirmed the Awards' application to the Named Appellants. Whether, and to what extent, they and the classes they seek to represent are ultimately entitled to recover on their statutory wage claims are questions we think best left for the state courts to address in the first instance and to resolve in the pending actions.

**CONCLUSION**

For the foregoing reasons, we conclude that (1) Appellants and Appellants-Intervenors were entitled to intervene in the district court proceedings; (2) the Union and the Employers did not clearly and unmistakably delegate the question of the arbitrability of Appellants' and Intervenors-Appellants' statutory wage claims to the arbitrator; and (3) Appellants and Intervenors-Appellants did not ultimately agree to submit their accrued wage claims to arbitration. The Arbitrator thus exceeded the scope of his authority insofar as he did not exclude them from the binding effect of the Awards. Appellants and Intervenors-Appellants are therefore free to pursue their statutory wage claims against the Named Employers—that is, CPC, UJC, FPC, and Alliance—in state court both individually, and possibly, in the state courts' discretion, on behalf of a class.

The judgments of the district court in Case Nos. 21-631, 21-633, and 22-1587 are **VACATED in part**, and the matters are **REMANDED** to the district court for entry of revised judgments.

**GLOSSARY**

**I.     Agreements**

- **The 2012 CBA**: The substantively identical collective bargaining agreements entered by the Union and each of the Employers in or about 2012. It prescribed a procedure for handling "grievances" (disputes arising from the CBA) and incorporated the AAA Rules by reference. App'x I at 90–127.

- **The 2014 MOA**: The Memoranda of Agreement entered into between the Union and each of the Employers in 2014. In response to recent changes in federal and state law, they provided primarily that the parties would meet in good faith to negotiate an alternative dispute resolution procedure for resolving certain statutory wage claims. App'x I at 129–135.

- **The 2015 MOA**: The Memoranda of Agreement entered into between the Union and each of the Employers in December 2015. They required that claims arising under certain wage-and-hour statutes be submitted to a specified grievance procedure that culminated in final and binding arbitration. App'x I at 137–148.

**II.     Parties and related persons or groups**

- **The Union**: 1199 SEIU United Healthcare Workers East, the labor union that represented the workers and brought the class-action arbitration claim in 2019 underlying these proceedings and then sought to confirm the First and Second Awards in the district court. It is Petitioner-Appellee here.

- **The Pre-2015 MOA Employees**: All of those home healthcare workers who were employed by a Respondent Employer but left their jobs before December 2015 and were no longer in a bargaining unit when the 2015 MOA was signed.

- **Appellants and Intervenor-Appellants**: A subset of the Pre-2015 MOA Employees. They are the individuals identified as such in the cases' caption. They

were employed by one of the Named Employers at some point but (they assert) were no longer employed by that Employer when the 2015 MOA was signed.

- **The Named Appellants**: The combined group of Appellants and Intervenors-Appellants here. By April 2022, each had sought to intervene in the district court proceedings confirming the First and Second Awards. They seek vacatur of the Awards as to them and the classes they seek to represent in state court. They are a subset of the Pre-2015 MOA Employees.

- **Intervenors**: Two individuals identified as such in the case caption. They appear to be Pre-2015 MOA Employees but they also appear not to have in fact obtained intervenor status in the district court and did not appeal the district court decisions.

- **Respondents and Respondent-Appellees**: All Respondents (as identified in the case caption) are Employers, that is, agencies in the home healthcare industry that participated in the 2019 arbitration and had a CBA with the Union. Respondent-Appellees are the two Employers who employed either an Appellant or an Intervenor-Appellant.

- **The Employers**: The home health care organizations that, individually, were party to the underlying arbitration proceedings and employed the Union members. They are Respondents here (and include Respondents-Appellees).

- **The (four) Named Employers**: The two Respondent-Appellee Employers and the two Respondent-Appellee Employers named in the tandem cases, Nos. 21-2106 and 21-2107. (The latter are also Respondents in the three present appeals.) Each employed at least one Appellant or Intervenor-Appellant, and, in related state court litigation, is alleged to have employed other Pre-2015 MOA Employees. By name, they are:

  o **Alliance**: Alliance for Health, Inc., Respondent here and Respondent- Appellee in *Alvarado*. It employed several Appellants.

59

- o **CPC**: The Chinese American Planning Council Home Attendant Program, Respondent-Appellee in these three cases. It employed several Intervenors-Appellants.

- o **FCP**: The First Chinese Presbyterian Community Affairs Home Attendant Corp., Respondent here and Respondent-Appellee in *Guzman*. It employed several Appellants.

- o **UJC**: United Jewish Council of the East Side Home Attendant Service Corp., Respondent-Appellee here. It employed several Intervenors-Appellants.

## III.    The decisions of the Arbitrator and the District Court

- **The First Award**: The arbitration award issued on April 17, 2020, in which the Arbitrator determined that he had jurisdiction to decide the threshold issues of arbitrability and that all Pre-2015 Employees' claims were arbitrable. App'x I at 41–88.

- **The First Confirmation Order:** The district court's February 19, 2021 decision denying Appellants' motions to intervene and confirming the First Award. *1199 SEIU United Healthcare Workers East v. PSC Community Services*, 520 F. Supp. 3d 588 (S.D.N.Y. 2021). It is the subject of the appeals filed in Nos. 21-631 and 21-633.

- **The Second Award**: The arbitration award issued on February 25, 2022, in which the Arbitrator ruled on the merits of the Union's claims, finding that the Employers committed the wage-and-hour violations as alleged, and prescribed a remedy, creating a "Special Wage Fund" with per-capita contributions to be made by each Employer. App'x II at 68–147.

- **The Preliminary Injunction Order:** The district court's April 7, 2022 decision denying the motions to intervene and to dismiss the Second Award that were filed by certain Appellants and Intervenor-Appellant. *1199 SEIU United*

60

*Healthcare Workers East v. PSC Community Services, et al.*, 597 F. Supp. 3d 557 (S.D.N.Y. 2021). No party separately appeals this order, although some of its determinations are wrapped into the Second Confirmation Order and challenged in the appeal of that decision.

- **The Second Confirmation Order:** The district court's June 24, 2022 decision denying Appellants' motions to intervene and to vacate the Second Award and confirming that Award. *1199SEIU United Healthcare Workers East v. PSC Community Services*, 608 F. Supp. 3d 50 (S.D.N.Y. 2022). It is subject to the appeal filed in No. 22-1587.

61